10-1372-cv
Barclays Capital Inc. v. Theflyonthewall.com, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: August 6, 2010          Decided: June 20, 2011)

Docket No. 10-1372-cv

------------------------------------

BARCLAYS CAPITAL INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INC., and MORGAN STANLEY & CO. INC.,

Plaintiffs-Appellees,

- v -

THEFLYONTHEWALL.COM, INC.,

Defendant-Appellant.

------------------------------------

After a bench trial, the district court (Denise L. Cote, Judge) entered a judgment for the plaintiffs concluding that on seventeen occasions, the defendant had infringed the plaintiffs' copyrights in their research reports, and that by collecting and disseminating to its own subscribers the summary recommendations with respect to securities trading contained in the plaintiffs' reports, the defendant had committed the New York state-law tort of "hot news" misappropriation. To remedy the copyright violations, the district court ordered the defendant to pay statutory damages, prejudgment interest, and attorney's fees. The court also permanently enjoined the defendant from "further infringement of any portion of the copyrighted elements of any research reports generated by" the plaintiffs. Based on the

plaintiffs' "hot news" misappropriation claim, the district court also permanently enjoined the defendant from "dissemination of the Firms' Recommendations until one half-hour after the opening of the New York Stock Exchange or 10:00 a.m., whichever is later." The defendant appeals with respect to the judgment and injunction against it on the "hot news" misappropriation claim. We conclude that the plaintiffs' "hot news" misappropriation claim is preempted by federal copyright law. We reverse the judgment of the district court to that extent and remand with instructions to dismiss the claim.

Reversed in part and remanded. Judge Raggi concurs in the result by separate opinion.

Before: POOLER, SACK, and RAGGI, Circuit Judges.

GLENN F. OSTRAGER, Ostrager Chong Flaherty & Broitman P.C. (Joshua S. Broitman, of counsel), New York, NY, for Appellant.

R. BRUCE RICH, Weil Gotshal & Manges LLP (Benjamin Marks, Jonathan Bloom, and Lisa R. Eskow, of counsel), New York, NY, for Appellees.

KATHLEEN M. SULLIVAN, Quinn Emanuel Urquhart & Sullivan, LLP (Marc L. Greenwald, Jonathan B. Oblak, and Todd Anten, of counsel), New York, NY, for Amici Curiae Google Inc. and Twitter, Inc.

ANDREW L. DEUTSCH, DLA Piper LLP (US) (Nicholas Aldrich, of counsel), New York, NY, for Amici Curiae Advance Publications, Inc., Agence France-Presse, A.H. Belo Corporation, The Associated Press, Belo Corp., The E.W. Scripps Company, Gannett Company, Inc.,

2

The McClatchy Company, Newspaper Association of America, The New York Times Company, Philadelphia Media Holdings, LLC, Stephens Media LLC, Time Inc., and the Washington Post.

STEPHEN KINNAIRD, Paul, Hastings, Janofsky & Walker LLP (Barry Sher, William F. Sullivan, Peter M. Stone, and Morgan J. Miller, of counsel), Washington, DC, for Amicus Curiae The Securities Industry and Financial Markets Association.

Christopher A. Mohr, Meyer, Klipper & Mohr, PLLC, Washington, DC, for Amicus Curiae Reed Elsevier Inc.

Robert P. LoBue, Patterson Belknap Webb & Tyler LLP, New York, NY, for Amicus Curiae Dow Jones & Company, Inc.

William D. Edick, Pickard & Djinis LLP, Washington, DC, for Amicus Curiae The Investorside Research Association.

Henry R. Kaufman, Henry R. Kaufman, P.C. (Michael K. Cantwell, of counsel), New York, NY, for Amicus Curiae StreetAccount LLC.

Fred von Lohmann (Corynne McSherry, of counsel), San Francisco, CA), for Amici Curiae Citizen Media Law Project, Electronic Frontier Foundation, and Public Citizen, Inc.

SACK, Circuit Judge:

The parties, the district court, and amici have raised a wide variety of interesting legal and policy issues during the course of this litigation.  We need not address most of them.  We conclude that under principles that are well established in this Circuit, the plaintiffs' claim against the defendant for "hot

news" misappropriation of the plaintiff financial firms' recommendations to clients and prospective clients as to trading in corporate securities is preempted by federal copyright law. Based upon principles explained and applied in National Basketball Association v. Motorola, Inc., 105 F.3d 841 (2d Cir. 1997) (sometimes hereinafter "NBA"), we conclude that because the plaintiffs' claim falls within the "general scope" of copyright, 17 U.S.C. § 106, and involves the type of works protected by the Copyright Act, 17 U.S.C. §§ 102 and 103, and because the defendants' acts at issue do not meet the exceptions for a "hot news" misappropriation claim as recognized by NBA, the claim is preempted. We therefore reverse the judgment of the district court with respect to that claim.

The plaintiffs-appellees -- Barclays Capital Inc. ("Barclays");[1] Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"); and Morgan Stanley & Co. Inc. ("Morgan Stanley") (collectively, the "Firms") -- are major financial institutions that, among many other things, provide securities brokerage services to members of the public. Largely in that connection, they engage in extensive research about the business and prospects of publicly traded companies, the securities of those companies, and the industries in which those companies are

---

[1] Lehman Brothers, Inc. was originally a party to this action. Following Barclays' acquisition in late 2008 of Lehman's North American operations, Barclays successfully moved to substitute itself for Lehman Brothers as a plaintiff.

engaged.  The results of the research are summarized by the Firms in reports, which customarily contain recommendations as to the wisdom of purchasing, holding, or selling securities of the subject companies.  Although the recommendations and the research underlying them in the reports are inextricably related, it is the alleged misappropriation of the recommendations, each typically contained in a single sentence, that is at the heart of the district court's decision[2] and the appeal here.

Each morning before the principal U.S. securities markets open, each Firm circulates its reports and

_____

[2]  The district court made this emphatically clear in the first three sentences of its opinion:

> This litigation confronts the phenomenon of the rapid and widespread dissemination of financial services firms' equity research recommendations through unauthorized channels of electronic distribution.  This dissemination frequently occurs before the firms have an opportunity to share these recommendations with their clients -- for whom the research is intended -- and to encourage the clients to trade on those recommendations.  The firms contend that their recommendations are "hot news" and that the regular, systematic, and timely taking and redistribution of their recommendations constitutes misappropriation, which is a violation of the New York common law of unfair competition.

Barclays Capital Inc. v. Theflyonthewall.com ("Fly I"), 700 F. Supp. 2d 310, 313 (S.D.N.Y. 2010) (emphases added).  The court later defined "Recommendations" as "actionable reports," which "are those that upgrade or downgrade a security; begin research coverage of a company's security . . . ; or predict a change in the security's target price."  Id. at 316.

5

recommendations for that day to clients and prospective clients. The recipients thus gain an informational advantage over non-recipients with respect to possible trading in the securities of the subject companies both by learning before the world at large does the contents of the reports and, crucially for present purposes, the _fact_ that the recommendations are being made by the Firm. The existence of that fact alone is likely to result in purchases or sales of the securities in question by client and non-client alike, and a corresponding short-term increase or decrease in the securities' market prices. The Firms and similar businesses, under their historic and present business models, profit from the preparation and circulation of the reports and recommendations principally insofar as they earn brokerage commissions when a recipient of a report and recommendation turns to the firm to execute a trade in the shares of the company being reported upon.

The defendant-appellant is the proprietor of a news service distributed electronically, for a price, to subscribers. In recent years and by various means, the defendant has obtained information about the Firms' recommendations before the Firms have purposely made them available to the general public and before exchanges for trading in those shares open for the day. Doing so tends to remove the informational and attendant trading advantage of the Firms' clients and prospective clients who are authorized recipients of the reports and recommendations. The

recipients of the information are, in turn, less likely to buy or sell the securities using the brokerage services of the reporting and recommending Firms, thereby reducing the incentive for the Firms to create such reports and recommendations in the first place. This, the Firms assert, will destroy their business models and have a severely deleterious impact on their ability to engage in further research and to create further reports and recommendations.

In an attempt to preserve their business models, the Firms have increasingly taken measures to seek to prevent or curtail such pre-market -- and therefore, from their point of view, premature -- public dissemination of their recommendations. As the district court reported in Barclays Capital Inc. v. Theflyonthewall.com ("Fly I"), 700 F. Supp. 2d 310 (S.D.N.Y. 2010), the Firms have, for example: "communicated to their employees that the unauthorized dissemination of their equity research or its contents is a breach of loyalty to the Firm, undermines the Firm's creation of revenue, and can result in discipline, including firing," id. at 319-20; included in their licensing agreements with third-party distributors and in the reports themselves provisions prohibiting redistribution of their content, id. at 320; adopted policies limiting public dissemination of the reports and the information they contain, id.; and employed emerging Internet technology by which the Firms can seek to find the source of such "leaks" and to "plug" them,

7

id. It is not clear from the record the extent to which these efforts are currently effective, but no concern has been expressed to us as to their legality or legitimacy.

The Firms instituted this litigation as part of the same endeavor. The first of their two sets of claims against the defendant sounds in copyright and is based on allegations of verbatim copying and dissemination of portions of the Firms' reports by the defendant. The Firms have been entirely successful on these copyright claims. See Fly I, 700 F. Supp. 2d at 328 ("Fly no longer disputes . . . that it infringed the copyrights in [seventeen of the Firms' reports]. . . . [J]udgment shall [therefore] be entered for the [Firms] on their claims of copyright infringement."). Although the extent to which the Firms' success on the copyright claims has alleviated their overall concerns is not clear, their victory on these claims is secure: Fly has not challenged the resulting injunction on appeal. Appellant's Br. at 61.

What remains before us, then, is the second set of claims by the Firms, alleging that Fly's early republication of the securities recommendations that the Firms create -- their "hot news" -- is tortious under the New York State law of misappropriation. The district court agreed and granted carefully measured injunctive relief. It is to the misappropriation cause of action that this appeal and therefore this opinion is devoted.

8

**BACKGROUND**

We find little to take issue with in the district court's careful findings of facts, to which we must in any event defer. We therefore borrow freely from them.[3]

<u>The Firms and their Research Reports</u>

The Firms are multinational financial entities that provide a variety of asset management, sales and trading, investment banking, and brokerage services to institutional investors, businesses of various sizes, and individuals. Among their many activities, the Firms compile research reports on specific companies whose securities are publicly traded, on industries, and on economic conditions generally. They disseminate such reports and accompanying trading recommendations to clients, such as hedge funds, private equity firms, pension funds, endowments, and individual investors. The reports, which vary in format, range from a single page to hundreds of pages in length. They typically include data analysis, qualitative discussion, and the recommendation. In the process of producing and disseminating the reports, the Firms employ hundreds of research analysts and spend hundreds of millions of dollars annually.

---

[3] The irony of doing so in the context of a copyright-infringement and "hot news"-misappropriation case is not lost on us.

9

In preparing a company report, an analyst will gather data related to its business, and may visit its physical facilities, converse with industry experts or company executives, and construct financial or operational models.  The analyst then uses that information in light of his or her expertise, experience, and judgment to arrive at formal projections and recommendations regarding the value of the company's securities.

This litigation concerns the trading "Recommendations," a term which the district court defined as "actionable reports," i.e., Firm research reports "likely to spur any investor into making an immediate trading decision.[4]  Recommendations upgrade or downgrade a security; begin research coverage of a company's security (an event known as an 'initiation'); or predict a change in the security's target price."  Fly I, 700 F. Supp. 2d at 316. The better known and more respected an analyst is, the more likely that a recommendation for which he or she is primarily responsible will significantly affect the market price of a security.

Most Recommendations are issued sometime between midnight and 7 a.m. Eastern Time, allowing stock purchases to be made on the market based on the reports and Recommendations upon

---

[4]  We refer to Recommendations by the Firms, as opposed to others who make recommendations but are not party to this litigation, with a capital "R."

the market opening at 9:30 a.m.[5]  Timely receipt of a

Recommendation affords an investor the opportunity to execute a

trade in the subject security before the market has absorbed and

responded to it.

The Firms typically provide complimentary copies of the

reports and Recommendations to their institutional and individual

clients using a variety of methods.[6]  The Firms then conduct an

---

[5]  Securities may be traded off the exchange before the exchange or exchanges on which the securities are traded open. For example, shares of Boeing stock closed at 65.26 on the last business day of 2010.  See http://www.bigcharts.com/custom/wsjie/ wsjbb-historical.asp?symb=BA&close_date=12/31/2010 (latest visit Jan. 19, 2011).  Before trading reopened on the first trading day of the New Year, the Wall Street Journal reported:  "Boeing Raised To Overweight From Neutral by J.P. Morgan," Wall St. J. (Jan. 3, 2011, 7:47 a.m.), available to subscribers at http://online.wsj.com/article_email/ BT-CO-20110103-702795-k IyVDAtMUMxTzAtMzIwMDMxWj.html, and before market opening, that "[f]inancial-services firm J.P. Morgan [today] upgraded Boeing Co. (BA) to overweight from neutral . . . .  J.P. Morgan raised its price target for Boeing to $83 from $80.  Shares of Boeing rose 1.6% in recent premarket action to $66.30," id. (emphasis added).  The stock closed up another ten cents, at $66.40, at the close of trading for the day.  See http://www.bigcharts.com/custom/ wsjie/wsjbb-historical.asp?symb=BA&sid=8630&close_date=1/3/2011 (latest visit Jan. 27, 2011).

The parties and the district court have not treated pre-market trading as significant to the resolution of the issues before us, and we have been given no reason to do otherwise.

[6]  The Firms distribute reports directly to some of their clients via, inter alia, online platforms that the Firms maintain which provide authorized individuals with access to such research.  The Firms also grant licenses to third-party distributors such as Bloomberg, Thomson Reuters, FactSet, and Capital IQ to distribute the reports and Recommendations on their respective platforms.

The universe of authorized report recipients is

11

orchestrated sales campaign in which members of their sales forces contact the clients the Firms think most likely to execute a trade based upon the Recommendation, with the understanding that continued receipt of reports and Recommendations may be made contingent on the generation of a certain level of trading commissions paid to the Firm.[7]

The Firms contend that clients are much more likely to place a trade with a Firm if they learn of the Recommendation directly from that Firm rather than elsewhere, and estimate that more than sixty percent of all trades result from Firm solicitations, including those highlighting Recommendations. It is from the commissions on those trades that Firms profit from the creation and dissemination of their reports and Recommendations. They assert that the timely, exclusive delivery

---

strikingly large. Morgan Stanley estimates that it distributes its research reports to 7,000 institutional clients and 100,000 individual investors. Each institutional client may in turn identify multiple employees to receive reports. Morgan Stanley estimates that in aggregate approximately 225,000 separate people are authorized to receive its reports.

[7] Each of the Firms conducts a daily morning meeting at roughly 7:15 a.m. During this meeting, analysts will describe to the sales force interesting or important Recommendations issued the previous night. Starting around 8:00 a.m., the sales staff will in turn call, e-mail, and instant message clients to draw their attention to the report and Recommendation, in the hopes that a client will decide to place a trade with the Firm as a result of this contact, earning the firm a commission.

of research and Recommendations therefore is a key to what they frequently refer to as their "business model."[8]

Theflyonthewall.com

The defendant-appellant Theflyonthewall.com, Inc. ("Fly") is, among other things, a news "aggregator." For present purposes, "[a]n aggregator is a website that collects headlines and snippets of news stories from other websites. Examples include Google News and the Huffington Post." Tony Rogers, "Aggregator," About.com Guide, available at http://journalism.about.com/od/journalismglossary/g/ aggregatordefinition.htm (latest visit Jan. 4, 2011).

Understanding that investors not authorized by the Firms to receive the reports and Recommendations are interested in and willing to pay for early access to the information contained in them -- especially the Recommendations, which are particularly likely to affect securities prices -- several aggregators compile securities-firm recommendations, including

---

[8] Firm witnesses repeatedly referred to their concern for the well-being of their "business models." See, e.g., Hurewitz Aff. in lieu of direct testimony (referring to the "business model" four times), and his articulate testimony on cross examination and redirect examination in open court, reproduced at Appendix 749-870 (referring to "business model" fifteen times); see also Fly I, 700 F. Supp. 2d at 315 (titling the first section of its findings of fact, "The Firms' Equity Research Business Model."); id. at 342 ("[C]ommon sense and the circumstantial evidence about the plaintiffs' business model make the Firms' contentions about its reduced incentives utterly credible."); and references to the Firms' "business models" in Appellees' Br. at 10, 24, 25, 39, and 42 (twice).

the Recommendations of the Firms, sometimes with the associated reports or summaries thereof, and timely provide the information to their own subscribers for a fee. Fly is one such company. It employs twenty-eight persons, about half of whom are devoted to content production. It does not itself provide brokerage, trading, or investment-advisory services beyond supplying that information.

Typical clients of the Firms are hedge funds, private equity firms, pension funds, endowments, and wealthy individual investors. By contrast, Fly's subscribers are predominately individual investors, institutional investors, brokers, and day traders. These customers purchase one of three content packages on Fly's website, paying between $25 and $50 monthly for unlimited access to the site.

In addition to maintaining its website, Fly distributes its content through third-party distributors and trading platforms, including some, such as Bloomberg and Thomson Reuters, that also separately provide authorized dissemination of the Firms' Recommendations. Fly has about 3,300 direct subscribers through its website, and another 2,000 subscribers who use third-party platforms to receive the service.

Fly characterizes itself as a source for breaking financial news, claiming to be the "fastest news feed on the web." Fly I, 700 F. Supp. 2d at 322 (internal quotation marks omitted). It advertises that its "quick to the point news is a

14

valuable resource for any investment decision." Id. Fly has emphasized its access to analyst research, saying that its newsfeed is a "one-stop solution for accessing analyst comments," and brags that it posts "breaking analyst comments as they are being disseminated by Wall Street trading desks, consistently beating the news wires." Id. at 322–23 (internal quotation marks omitted).

The cornerstone of Fly's offerings is its online newsfeed, which it continually updates between 5:00 a.m. and 7:00 p.m. during days on which the New York Stock Exchange is open. The newsfeed typically streams more than 600 headlines a day in ten different categories, including "hot stocks," "rumors," "technical analysis," and "earnings." One such category is "recommendations." There, Fly posts the recommendations (but not the underlying research reports or supporting analysis) produced by sixty-five investment firms' analysts, including those at the plaintiff Firms. A typical Recommendation headline from 2009, for example, reads "EQIX: Equinox initiated with a Buy at BofA/Merrill. Target $110." Id. at 323.

Fly's headlines, including those in the "recommendations" category, are searchable and sortable. Users can also subscribe to receive automated e-mail, pop-up, or audio alerts whenever Fly posts content relevant to preselected companies' securities.

15

Fly publishes most of its recommendation headlines before the New York Stock Exchange opens each business day at 9:30 a.m. Fly estimates that the Firms' Recommendation headlines currently comprise approximately 2.5% of Fly's total content, down from 7% in 2005.

According to Fly, over time it has changed the way in which it obtains information about recommendations. Some investment firms, such as Wells Fargo's investment services, will send Fly research reports directly as soon as they are released. Others, including the plaintiff Firms, do not. Until 2005, for recommendations of firms that do not, including the plaintiff Firms, Fly relied on employees at the investment firms (without the firms' authorization) to e-mail the research reports to Fly as they were released. Fly staff would summarize a recommendation as a headline (e.g., "EQIX initiated with a Buy at BofA/Merrill. Target $110."). Sometimes Fly would include in a published item an extended passage taken verbatim from the underlying report.

Fly maintains that because of threats of litigation in 2005, it no longer obtains recommendations directly from such investment firms. Instead, it gathers them using a combination of other news outlets, chat rooms, "blast IMs" sent by people in the investment community to hundreds of recipients, and conversations with traders, money managers, and its other

contacts involved in the securities markets.[9]  Fly also represents that it no longer publishes excerpts from the research reports themselves, and now disseminates only the Recommendations, typically summarizing only the rating and price target for a particular stock.

### The Firms' Response to The Threat Posed by Fly and Other Aggregators

Because the value of the reports and Recommendations to an investor with early access to a Recommendation is in significant part derived from the informational advantage an early recipient may have over others in the marketplace, most of the trading the Firms generate based on their reports and Recommendations occurs in the initial hours of trading after the principal U.S. securities markets have opened.  Such sales activity typically slackens by midday.  The Firms' ability to generate revenue from the reports and Recommendations therefore directly relates to the informational advantage they can provide to their clients.  This in turn is related to the Firms' ability to control the distribution of the reports and Recommendations so that the Firms' clients have access to and can take action on the reports and Recommendations before the general public can.[10]

---

[9]  The Firms allege, and the district court found, that Fly continued to use reports sent by sources inside the Firms as late as June 2006.  Fly I, 700 F. Supp. 2d at 327 n.25.

[10]  The Firms also generate revenue from these reports, through what is known as the "embargoed market."  The embargoed market receives reports one to two weeks after initial

The Firms have employed a variety of measures in an attempt to stem the early dissemination of Recommendations to non-clients. Most of them have either been instituted or augmented relatively recently in response to the increasing availability of Recommendations from Fly and competing aggregators and news services. The Firms describe these steps as follows:

> The Firms have made a "very substantial and costly effort to study the unauthorized dissemination of their research reports and . . . to plug the leaks they have found." Merrill Lynch, for example, has: (a) worked with third-party vendors to limit access to Merrill Lynch clients; (b) employed an internal security program to detect breaches of security; (c) investigated Merrill Lynch employees, including a review of cell phones, for leaks to third parties; (d) internalized Merrill Lynch's email subscription system; (e) identified and blacklisted websites that seek to post links to Merrill Lynch content; and (f) created unique signature URLs when links to research are sent to clients so that clients' usage can be monitored and abuse tracked. [citation to record] (describing breach control as an "all-consuming task"). Barclays and Morgan Stanley have undertaken comparable measures to protect their research.

> Each Firm has a restrictive media and communications policy intended to preserve the time-sensitive value of Recommendations for their clients. The policies provide that

---

distribution. Customers on the embargoed market, such as law firms, consulting firms, and universities, pay per-report or subscription fees to receive the Firms' reports. Revenues from the embargoed market are relatively modest and are immaterial to this appeal.

18

> any disclosure of equity research to the press occurs only after expiration of a prescribed period of time, and even then it is limited to entities that use the research as part of contextual news reporting and analysis.

Appellees' Br. at 13 (citations omitted).  As outlined above, the district court also cataloged these efforts, emphasizing their increasing intensity "in recent years."[11]  It is not clear from the record, however, the extent to which these efforts increased in response to the actions of Fly and others similarly disseminating the Recommendations on Internet-borne services, nor does the record disclose how successful the measures have been.  Fly has not challenged the legality of the Firms' anti-dissemination efforts in these proceedings.[12]

---

[11]  See Fly I, 700 F. Supp. 2d at 318 ("In recent years, the Firms have redoubled their efforts to manage 'entitlements' on these third-party platforms so that no one can access their research through the licensed distributors that would not already have direct access through the Firms themselves."); id. at 319 ("To wring the most value from their research, the Firms have worked hard in recent years to tighten control over who may view their research output."); id. at 320 ("The media and communications policies at each of the Firms have been tightened in recent years to ensure that disclosure of Recommendations to the press does not undermine the ability of the Firms to generate trading revenue.").

[12]  The contractual terms the Firms impose on their clients are presumably enforceable irrespective of the viability of a "hot news" cause of action.  See ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1454–55 (7th Cir. 1996) (Easterbrook, J.) (quoted with approval in a related context in NBA, 105 F.3d at 849).

## The Complaint and Pre-Trial District Court Proceedings

In 2004, the Firms identified Fly as one of several entities systematically publishing the Recommendations without the Firms' permission.  Others doing the same included larger and better-known news outlets with far broader audiences, such as Bloomberg, Dow Jones, and Thomson Reuters.[13]  All of them regularly post short headlines reporting Recommendations soon after they become available.[14]  The Firms nonetheless focused their legal actions in this regard on Fly.

In March and April 2005, the Firms complained to Fly that its publication of the Firms' Recommendations in February and March of that year infringed the Firms' copyrights and was tortious under New York State's "hot news" misappropriation doctrine.  The Firms demanded that Fly cease and desist.  Fly's counsel responded in April and May 2005, representing that Fly had altered its reporting practices so that it no longer obtained the Recommendations from research reports sent by employees of the Firms, instead gathering the information from independent,

---

[13]  Some such outlets are also licensed distributors of Firm Recommendations and reports.  <u>See</u> <u>supra</u> n.6.  In those cases, Firms normally insist that distributors maintain "firewalls" to divide the distributors' research and media arms, which in theory will prevent organizations from reporting on Recommendations and reports by virtue of their status as licensed distributors.  <u>Fly I</u>, 700 F. Supp. 2d at 318.

[14]  Bloomberg recently hired Fly's Chief Operating Officer to oversee its publication of Firm Recommendations.  <u>Fly I</u>, 700 F. Supp. 2d at 326 n.23.

public sources. Fly continued posting the Firms' Recommendations. On June 26, 2006, the Firms filed this suit naming Fly as the sole defendant.

The Firms assert two causes of action in their complaint: copyright infringement based on Fly's extensive excerpting of 17 research reports released in February and March 2005, and "hot news" misappropriation based on Fly's continual electronic publication of the Firms' Recommendations. The gravamen of the latter claim is that the aggregate widespread, unauthorized reporting of Recommendations by Fly and other financial news providers -- including better known, better financed, more broadly accessed outlets -- has threatened the viability of the Firms' equity research operations. The Firms allege that this unauthorized distribution allows clients and prospective clients to learn of Recommendations from sources other than the Firms before the Firms' sales staff can reach out to them to solicit their business, thereby reducing the ability of research to drive commission revenue. This, they assert, seriously threatens their ability to justify the expense of maintaining their extensive research operations.

On August 16, 2006, Fly answered, raising several affirmative defenses, including "fair use" and protections

purportedly afforded to it and its dissemination of news by the First Amendment.[15]

On May 18, 2009, after completion of discovery, the Firms and Fly cross-moved for summary judgement.  The district court (Denise L. Cote, <u>Judge</u>) denied the summary judgment motions on November 6, 2009.  The Firms then waived their claims for actual damages, and the court set the case for a bench trial.

<u>The Trial and The District Court Decision</u>

In a joint pre-trial order dated February 12, 2010, the parties stipulated to, among other things, the district court's jurisdiction and the identification of the issues presented for trial.  Joint Pre-Trial Order (Dkt. No. 167), <u>Barclays Capital Inc. v. Theflyonthewall.com</u>, No. 06-cv-4908 (S.D.N.Y. April 21, 2010) (the "Joint Pre-trial Order").  The parties also agreed that:

> The following affirmative defenses previously asserted by Defendant are <u>not to be tried</u>:
>
> . . .
>
> Defendant's publication of daily news from firms in the financial industry, including Plaintiffs, is constitutionally protected by the First Amendment to the U.S. Constitution.

---

[15] Fly also asserted counterclaims for defamation, tortious interference with prospective business relations, and unfair competition.  These counterclaims were dismissed by the district court (George B. Daniels, <u>Judge</u>), which dismissal is not challenged on appeal.  <u>See</u> Order Dismissing Def.'s Counterclaims (Dkt. No. 20), <u>Barclays Capital Inc. v. Theflyonthewall.com</u>, No. 06-cv-4908 (S.D.N.Y. March 16, 2007).  The case was reassigned from Judge Daniels to Judge Cote on June 8, 2009.

22

Joint Pre-trial Order at 5 (emphasis in original).  The district court read this to mean that Fly had waived any First Amendment defenses to the Firms' "hot news" misappropriation claim.  See Barclays Capital Inc. v. Theflyonthewall.com ("Fly II"), 700 F. Supp. 2d 310, 352-54 (S.D.N.Y. 2010) (Opinion and Order Denying Stay).[16]

Fly also abandoned the "fair use" copyright-infringement defense, thereby effectively conceding liability on the copyright claim.  An injunction "which restrains Fly from further infringement of 'any portion of the copyrighted elements of any research reports' generated by Barclays Capital or Morgan Stanley," Fly I, 700 F. Supp. 2d at 331, was entered and, so far as we know, remains in effect.

In the pre-trial order, the Firms contended that they satisfied all five "elements" of the tort purportedly identified in NBA, 105 F.3d at 845, although the Firms did not explicitly refer to that case.  Joint Pre-Trial Order at 3.  Fly appeared to concede that the Firms generate their Recommendations at great expense and that the Recommendations are time-sensitive, but

[16]  Both Fly I, the district court's March 18, 2010 findings of fact and conclusions of law after trial, and Fly II, the court's May 7, 2010 ruling on Fly's subsequent motion to stay or modify the injunction, have the same citation: 700 F. Supp. 2d 310 (S.D.N.Y. 2010).  Fly I appears between 700 F. Supp. 2d 310 and 348, and Fly II between 700 F. Supp. 2d 348 and 356.

23

disputed the other three "elements" of the misappropriation claim. Id. at 4.

At a four-day bench trial in early March of last year, the witnesses for the plaintiffs were primarily Firm executives responsible for or familiar with a Firm's research activities. The defendant called, inter alios, Fly employees to testify, including Fly's President and majority owner, Ron Etergino. Inasmuch as Fly had effectively conceded liability for copyright infringement, the primary issues at trial were (1) the scope of remedies for copyright infringement, (2) whether Fly was liable for "hot news" misappropriation and, if so, (3) the appropriate remedy.

On March 18, 2010, the district court issued its Opinion and Order, deciding for the plaintiffs on both the copyright-infringement and the "hot news" misappropriation claims. It awarded the plaintiffs statutory damages and attorney's fees[17] related to the copyright infringement claim. As part of its judgment in favor of the plaintiffs on the misappropriation claim, the court entered an order, inter alia, enjoining Fly from reporting Recommendations for a period ranging from thirty minutes to several hours after they are released by

---

[17] In recognition of the economic disparity between Fly and the Firms, the district court limited its award to those litigation expenses that "directly and predominately concerned the [Firms'] prosecution of their copyright infringement claims." Fly I, 700 F. Supp. 2d at 331.

the plaintiffs. See Fly I, 700 F. Supp. 2d at 348; Permanent Injunction (Dkt. No 138), Barclays Capital v. Theflyonthewall.com, No. 06-cv-4908 (S.D.N.Y. March 18, 2010) (the "Permanent Injunction").

Relying upon one of two -- or arguably three -- iterations of NBA's multi-factor "test," the district court concluded that for a misappropriation claim under New York law to survive federal copyright law preemption, and for the plaintiff to succeed on the claim, the plaintiff is required to demonstrate that:

> (i) [it] generates or gathers information at a cost; (ii) the information is time-sensitive; (iii) a defendant's use of the information constitutes free riding on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened.

Fly I, 700 F. Supp. 2d at 334-35 (quoting NBA, 105 F.3d at 845).[18]  The district court concluded that the first two "elements" -- the cost of generating information and time-sensitivity -- were not disputed by Fly and in any case were easily met.  Id. at 335-36.

---

[18]  The district court omitted fifteen prefatory words from the NBA quotation that were unnecessary for the district court's purposes:  "We hold that the surviving 'hot-news' INS-like claim is limited to cases where . . . ."  NBA, 105 F.3d at 845.

The district court decided with respect to the third factor, "free riding," that, "[i]n essence, [it] exists where a defendant invests little in order to profit from information generated or collected by the plaintiff at great cost."  Id. at 336.  According to the court, "Fly does no equity research of its own, nor does it undertake any original reporting or analysis."  Id. at 336.

In deciding in the Firms' favor on this issue, the district court rejected Fly's argument that its efforts in the collection, aggregation, and dissemination of information were sufficient to avoid a finding of free-riding, on the ground that efforts contributed nothing to the actual Recommendations that Fly provided to its subscribers.  Id. at 336-37.  The court also disagreed with Fly's argument that its gathering of the Recommendations from public sources renders that information freely available for all:  "[T]he fact that others also engage in unlawful behavior does not excuse a party's own illegal conduct."  Id. at 337.

In concluding that the fourth factor, direct competition, was present, the district court relied on its finding that both Fly and the Firms were engaged in "disseminating Recommendations to investors for their use in making investment decisions," that production and distribution of the reports was among the Firms' "primary businesses," and that the companies used similar distribution channels.  Id. at 339-40.

The court also thought significant Fly's then-recent attempts to link its subscribers to discount brokerage services, which in the district court's view had the potential to further draw commission revenue away from the Firms.

The district court rejected Fly's contention that our decision in NBA required the court to find "head-to-head competition in a primary market," concluding that neither Fly's lack of brokerage and investment-advisory services nor its role as a news aggregator was inconsistent with a finding of direct competition. Id. at 340. The court appeared to conclude that Fly's other activities were immaterial, so long as Fly, like the Firms, was engaged in the business of disseminating Recommendations.

Finally, the district court concluded that the fifth factor, sufficiently reduced economic incentives, was present. The court found that "common sense and the circumstantial evidence about the plaintiffs' business model make the Firms' contentions about [their] reduced incentives utterly credible." Id. at 342. The Firms had asserted that they had been forced to cut their analyst staffs and budgets significantly during the previous five years, in significant measure although by no means exclusively because of competition from unauthorized redistributions of their Recommendations. They acknowledged, as did the court, that there were unrelated substantial causes for the contraction during this period, including the then-recent

27

recession and accompanying stock-market collapse, and the April 2003 Global Research Analyst Settlement.[19]

Fly sought to portray the Firms' evidence of reduced economic incentives, which was based almost entirely on the testimony of the Firms' own research executives, as speculative and self-serving. The district court concluded to the contrary (1) that the executives' testimony was credible despite their employment by the Firms, (2) that the Firms did not need to demonstrate actual harm, but rather merely show that harm would occur if Fly and others were allowed to continue their conduct, and (3) that the precise impact of the recent recession and the Global Research Analyst Settlement was irrelevant, because the mere showing that Fly and others like it significantly affected the Firms' incentives was sufficient to establish the fifth factor, even if other events also contributed to the reduction in incentives. Id. at 342-43.

Having concluded that the Firms had established the tort of "hot news" misappropriation, the district court entered a

---

[19] The Global Research Analyst Settlement resolved an SEC enforcement action aimed at conflicts of interest within investment firms. Allegedly, the banks' investment banking arms inappropriately pressured analysts to issue positive ratings to certain stocks in the hopes that such a rating would help the firm land that company's investment banking business. See Press Release, SEC, Ten of Nation's Top Investment Firms Settle Enforcement Actions Involving Conflicts of Interest Between Research and Investment Banking (Apr. 28, 2003), available at http://www.sec.gov/news/press/2003-54.htm (latest visit Jan. 11, 2011).

permanent injunction barring Fly from reporting a Recommendation until either (a) half an hour after the market opens, if the report containing the recommendation was released before 9:30 a.m., or (b) two hours after release, if the report was released after 9:30 a.m.[20]  This time period represented roughly the midpoint between what Fly and the Firms, respectively, requested.[21]

---

[20]  The injunction prohibited Fly from reporting a Recommendation until:

> (a) the later of one half-hour after the opening of the New York Stock Exchange or 10:00am . . . for those Recommendations first distributed prior to 9:30am, or (b) two hours after the Recommendation is first distributed by the sponsoring Plaintiff to its clients, for those Recommendations first distributed at or after 9:30am on a given day.

Permanent Injunction at 2-3.  Thus for a recommendation distributed at exactly 9:29 a.m., the ban on reporting would last thirty minutes, while for a recommendation distributed at 12:00 a.m., the ban would last for ten hours.

The injunction also contains a blanket, unconditional restriction on copyright infringement and on disseminating the dial-in number or pass codes for conference calls.

[21]  Several features of the injunction may create constitutional or statutory concern, including a provision allowing Fly to petition to modify or vacate the injunction if the Firms do not actively seek to stop similar misappropriation by other individuals or entities.  Some amici assert that this thrusts an impermissible duty to police on the part of the Firms. See Br. for Dow Jones & Co., Inc. as Amicus Curiae Supporting Neither Party at 11-14, Barclays Capital Inc. v. Theflyonthewall.com, Inc., No. 10-1372-cv (2d Cir. June 21, 2010); Br. for Advance Publ'ns, Inc. et al. as Amici Curiae Supporting Neither Party at 28-33, Barclays Capital Inc. v. Theflyonthewall.com, Inc., No. 10-1372-cv (2d Cir. June 21, 2010).  Because we reverse the judgment of the district court on

Perhaps because Fly purported to waive its First Amendment defenses, the district court's opinion contains no explicit discussion of First Amendment doctrine beyond the court's reference, in consideration of the propriety of injunctive relief, to "public policy considerations," and the balancing of "the public interest in unrestrained access to information." Id. at 344. Similarly, although in the court's thorough recitation of the history of the law of "hot news" misappropriation, it explained in some detail the role of Copyright Act preemption of state tort law, it did not expressly consider whether "hot news" misappropriation was preempted by federal copyright law in this case. Instead, it adopted as determinative NBA's ruling that a narrow form of the "hot news" misappropriation tort survives preemption, and it applied language from that decision indicating the tort's limitations by virtue of preemption doctrine.

Post-Trial Procedural History

Fly filed a notice of appeal on April 9, 2010. Four days later, it moved before the district court to stay or modify the injunction pending that appeal. In support of its motion, Fly argued (1) that it was likely to succeed on the merits on appeal, specifically with regard to the direct competition and

other grounds, we need not and do not reach the question of the propriety of the injunction.

30

reduced incentive elements of the misappropriation claim; (2) that it would suffer irreparable harm from the operation of the injunction as customers cancelled their subscriptions; and (3) that the injunction's curtailment of First Amendment protected speech required a finding of irreparable harm. On May 7, 2010, the district court denied Fly's motion on the grounds (1) that Fly was not likely to succeed on the merits of its appeal; (2) that Fly had shown evidence of only two instances of customers cancelling their subscriptions because of the injunction; and (3) that Fly had waived its First Amendment arguments prior to trial. See Fly II, 700 F. Supp. 2d at 349-56.

Fly thereupon moved in this Court for a stay of the injunction and an expedited appeal. On May 19, 2010, a panel of this Court granted the motion.

On appeal, Fly argues principally that (1) the district court erred in finding that the plaintiffs established "hot news" misappropriation under New York law, specifically in that the plaintiffs failed to prove time-sensitivity, free-riding, direct competition, and reduced incentives; (2) that the district court's injunction violates Fly's free-speech rights under the First Amendment; (3) that the district court's finding of "hot news" misappropriation violates the Copyright Clause of the Constitution and the Copyright Act; (4) that the district court

31

failed to apply the proper standard in granting injunctive relief; and (5) that the injunction is unreasonably overbroad.[22]

**DISCUSSION**

I.  Standard of Review

"When reviewing a judgment following a bench trial in the district court, we review the court's findings of fact for clear error and its conclusions of law de novo."  Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 96 (2d Cir.), cert. denied, 131 S. Ct. 647 (2010).

II.  Viability of the "Hot News" Misappropriation Tort

Amici Google, Inc. and Twitter, Inc., referring to the "hot news" misappropriation tort as an "end-run" around the Constitution's Copyright Clause and Supreme Court precedent, and arguing that their position is supported by "[i]mportant public policy concerns," urge us to "repudiate the tort."  Brief for Google, Inc. and Twitter, Inc. as Amici Curiae Supporting Reversal at 3, Barclays Capital Inc. v. Theflyonthewall.com, No. 10-1372-cv (2d Cir. June 22, 2010).

We need not address the viability vel non of a "hot news" misappropriation tort under New York law.  Were we to do

---

[22]  Initially, Fly also challenged the district court's award of attorney's fees to the Firms on the copyright infringement claims.  On July 15, 2010, however, following a partial settlement between the parties, Fly, with the Firms' consent, moved to withdraw its appeal as to the attorney's fees. See Consent Motion for Partial Withdrawal of Appeal, Barclays Capital Inc. v. Theflyonthewall.com, Inc., No. 10-1372-cv (2d Cir. July 15, 2010).

so, though, plainly we would be bound by the conclusion of the previous Second Circuit panel in NBA that the tort survives. See, e.g., United States v. Jass, 569 F.3d 47, 58 (2d Cir. 2009) (explaining the binding nature of one panel opinion on a subsequent panel of the same circuit); Meacham v. Knolls Atomic Power Lab., 461 F.3d 134, 141 (2d Cir. 2006) (similar), rev'd on other grounds, 554 U.S. 84 (2008). We are therefore without the authority to "repudiate" that view.

Were we indeed called upon to consider the continued viability of the tort under New York law, perhaps we would certify that issue to the New York Court of Appeals. The issue we address, however, is federal preemption. As a federal court, we answer that question ourselves.

III. Copyright Act Preemption

A. National Basketball Association v. Motorola, Inc.

National Basketball Association v. Motorola, Inc., 105 F.3d 841 (2d Cir. 1997), appears to be the only judicial decision -- surely the only decision binding upon us -- that addresses directly the preemption issue raised in this appeal.

There, defendant Motorola, Inc. produced and sold (or otherwise provided) to members of the public a telephonic pager called SportsTrax. Motorola's co-defendant, STATS, Inc., supplied statistical information about National Basketball Association ("NBA") professional basketball games. The information was transmitted to SportsTrax pagers owned or leased

33

by Motorola and STATS customers roughly simultaneously with the playing of the games. NBA, 105 F.3d at 843. "The information included "(i) the teams playing; (ii) score changes; (iii) the team in possession of the ball; (iv) whether the team is in the free-throw bonus; (v) the quarter of the game; and (vi) time remaining in the quarter." Id. at 844.

> The information [was] updated every two to three minutes, with more frequent updates near the end of the first half and the end of the game. There [was] a lag of approximately two or three minutes between events in the game itself and when the information appear[ed] on the pager screen.

Id.

SportsTrax gathered the information for the service by employing persons who would watch the games on television or listen to accounts of them on the radio and supply the information to STATS's host computer. The computer compiled, analyzed, and formatted the data for retransmission. The information was then sent to FM radio stations which retransmitted them to the subscribers' individual SportsTrax pagers.[23] Id.

---

[23] The information was also sent to customers using web-based America Online ("AOL") facilities, but the Court focused its legal analysis on the SportsTrax system. NBA, 105 F.3d at 844 ("[W]e regard the legal issues as identical with respect to both products, and our holding applies equally to SportsTrax and STATS's AOL site.").

The NBA itself also publicly disseminated similar, and therefore to some extent competitive, information.  As Judge Winter wrote for the NBA panel:

> [T]he NBA does provide, or will shortly do so, information like that available through SportsTrax.  It now offers a service called "Gamestats" that provides official play-by-play game sheets and half-time and final box scores within each arena.  It also provides such information to the media in each arena. In the future, the NBA plans to enhance Gamestats so that it will be networked between the various arenas and will support a pager product analogous to SportsTrax. SportsTrax will of course directly compete with an enhanced Gamestats.

Id. at 853.

The district court whose decision was on appeal in NBA had found for the plaintiff on its New York-law "hot news" misappropriation claim arising out of the defendants' taking, redistributing, and profiting from the facts generated by the NBA in the course of the playing of NBA games.  The district court therefore had entered a permanent injunction against the defendants, but stayed that injunction pending appeal.  Id.

35

## 1. NBA Preemption Analysis.[24]

### a. Copyright Act

The NBA panel began its analysis by noting that prior to the 1976 amendments to the Copyright Act, the Act contained no express provisions as to the circumstances under which the federal copyright law preempted state law. The 1976 Amendments changed that.

Title 17 U.S.C. § 301, enacted in 1976, sets forth a two-part test to determine whether a state-law claim is preempted by the Copyright Act, with a further "extra elements" exception we discuss below. Such a claim is preempted (i) if it seeks to vindicate "legal or equitable rights that are equivalent" to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106 -- the "general scope requirement"; and (ii) if the work in question is of the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103 --

---

[24] In addition to addressing preemption of the "hot news" misappropriation tort, the panel concluded that the defendants did not infringe a copyright in the underlying games, which were not copyrightable, NBA, 105 F.3d at 846-47, or of broadcasts of the games "because they reproduced only facts from the broadcasts, not the expression or description of the game that constitutes the broadcast," id. at 847. Neither conclusion is directly relevant to the issues raised on appeal here.

the "subject matter requirement."[25]  NBA, 105 F.3d at 848 (quoting 17 U.S.C. § 301).

The NBA panel observed that "[t]he subject matter requirement" -- the second factor in a preemption analysis -- "is met when the work of authorship being copied or misappropriated 'falls within the ambit of copyright protection.'"  Id. at 849

---

[25]

§ 301. Preemption with respect to other laws

(a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to--

(1) subject matter that does not come within the subject matter of copyright as specified by sections 102 and 103, including works of authorship not fixed in any tangible medium of expression; or
. . .

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.

17 U.S.C. § 301.

37

(quoting Harper & Row, Inc. v. Nation Enters., 723 F.2d 195, 200 (1983) (brackets omitted), rev'd on other grounds, 471 U.S. 539 (1985)). In deciding whether a state-law claim is preempted by the Copyright Act, then, it is not determinative that the plaintiff seeks redress with respect to a defendant's alleged misappropriation of uncopyrightable material -- e.g., facts -- contained in a copyrightable work. "Copyrightable material often contains uncopyrightable elements within it, but Section 301 preemption bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements," if the work as a whole satisfies the subject matter requirement.[26] NBA, 105 F.3d at 849; see also id. at 850 (quoting ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1453 (7th Cir. 1996)).

In NBA, facts about what transpired during broadcasted NBA basketball games thus fell within the subject matter of copyright for the purpose of the court's preemption analysis,

---

[26] The NBA Court observed that "[t]he legislative history supports this understanding of Section 301(a)'s subject matter requirement. The House Report stated:

> As long as a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain.

NBA, 105 F.3d at 849 (quoting H.R. Rep. No. 94-1476, at 131 (1976), reprinted in 1976 U.S.C.C.A.N. at 5659, 5747).

38

even though the games themselves were not copyrightable.  Id. at 848-49 ("Although game broadcasts are copyrightable while the underlying games are not, the Copyright Act should not be read to distinguish between the two when analyzing the preemption of a misappropriation claim based on copying or taking from the copyrightable work.").

Turning to the other preemption element, the NBA panel thought it clear that what the NBA was seeking to protect fell within the "general scope of copyright."  Title 17 U.S.C. § 106, which states that the general scope of copyright, "affords a copyright owner the exclusive right to: (1) reproduce the copyrighted work; (2) prepare derivative works; (3) distribute copies of the work by sale or otherwise; and, with respect to certain artistic works, (4) perform the work publicly; and (5) display the work publicly.  See 17 U.S.C. 106(1)-(5)."  Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992).  "Section 301 [of the Copyright Act] thus preempts only those state law rights that 'may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law," id. (quoting Harper & Row, 723 F.2d at 200), i.e., "acts of reproduction, performance, distribution or display," id. (internal quotation marks omitted). The claim of tortious behavior in NBA was indeed for the acts of reproduction, distribution, and display of facts by the defendants of material taken from the copyrighted broadcasts.

39

The NBA panel therefore concluded that the plaintiff's tort claim was within the general scope of copyright.

The court was thus satisfied that both preemption factors were met.

**b. Extra-Element Test**

Having decided that the two preliminary factors counseled in favor of preemption, the NBA panel observed:

> [C]ertain forms of commercial misappropriation otherwise within the general scope requirement will survive preemption if an "extra-element" test is met. As stated in Altai:
>
> > But if an "extra element" is "required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie 'within the general scope of copyright,' and there is no preemption."
>
> Altai, 982 F.2d at 716 (quoting 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 1.01[B] at 1-14–15 (1991)).

NBA, 105 F.3d at 850; see also Harper & Row, 723 F.3d at 200 ("[W]hen a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur."). It is with respect to the "extra elements" that the NBA Court proffered a three-factor analysis: "We . . . find the extra elements -- those in addition to the elements of copyright infringement -- that allow a 'hotnews' claim to survive

40

preemption are: (i) the time-sensitive value of factual information, (ii) the free-riding by a defendant, <u>and</u> (iii) the threat to the very existence of the product or service provided by the plaintiff."  <u>Id.</u> at 853 (emphasis added).

                    i. <u>International News Service v. Associated Press</u>

        The <u>NBA</u> Court briefly summarized the Supreme Court's seminal 1918 "hot news" decision, <u>International News Service v. Associated Press</u>, 248 U.S. 215 (1918) ("<u>INS</u>"):

> <u>INS</u> involved two wire services, the Associated Press ("AP") and International News Service ("INS"), that transmitted news stories by wire to member newspapers.  <u>Id.</u> INS would lift factual stories from AP bulletins and send them by wire to INS papers.  <u>Id.</u> at 231.  INS would also take factual stories from east coast AP papers and wire them to INS papers on the west coast that had yet to publish because of time differentials.  <u>Id.</u> at 238.  The Supreme Court held that INS's conduct was a common-law misappropriation of AP's property.  <u>Id.</u> at 242.

<u>NBA</u>, 105 F.3d at 845.

        <u>INS</u> itself is no longer good law.  Purporting to establish a principal of federal common law, the law established by <u>INS</u> was abolished by <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64 (1938), which largely abandoned federal common law.  But, as the <u>NBA</u> panel pointed out, "[b]ased on legislative history of the 1976 [Copyright Act amendments], it is generally agreed that a 'hot-news' <u>INS</u>-like claim survives preemption."  <u>NBA</u>, 105 F.3d at 845 (citing H.R. Rep. No. 94-1476 at 132).

41

The House of Representatives Report with respect to the preemption provisions of the 1976 Copyright Act amendments commented in this regard:

> "Misappropriation" is not necessarily synonymous with copyright infringement, and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by [17 U.S.C. §] 106 [specifying the general scope of copyright] nor on a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of [INS], or in the newer form of data updates from scientific, business, or financial data bases.

H.R. No. 94-1476 at 132, reprinted in 1976 U.S.C.C.A.N. at 5748 (footnote omitted), quoted in NBA, 105 F.3d at 850. The House Report thus anticipated that INS-like state-law torts would survive preemption. It did not itself create such a cause of action or recognize the existence of one under federal law. It allowed instead for the survival of such a state-law claim.

The NBA Court thus used INS as a description of the type of claims -- "INS-like" -- that, Congress has said, are not necessarily preempted by federal copyright law. Some seventy-five years after its death under Erie, INS thus maintains a ghostly presence as a description of a tort theory, not as precedential establishment of a tort cause of action.

42

                    ii.  Moral Dimensions

        One source of confusion in addressing these misappropriation cases is that <u>INS</u> itself was a case brought in equity to enjoin INS from copying AP's uncopyrightable news.  In that context, the <u>INS</u> Court emphasized the unfairness of INS's practice of pirating AP's stories.  It condemned, in what sounded biblical in tone, the defendant's "reap[ing] where it ha[d] not sown."[27]  <u>INS</u>, 248 U.S. at 239.  The Court said:

> This defendant . . . admits that it is taking
> material that has been acquired by
> complainant as the result of organization and
> the expenditure of labor, skill, and money,
> and which is salable by complainant for
> money, and that defendant in appropriating it
> and selling it as its own is endeavoring to
> reap where it has not sown, and by disposing
> of it to newspapers that are competitors of
> complainant's members is appropriating to
> itself the harvest of those who have sown.
> Stripped of all disguises, the process
> amounts to an unauthorized interference with
> the normal operation of complainant's
> legitimate business precisely at the point
> where the profit is to be reaped, in order to
> divert a material portion of the profit from
> those who have earned it to those who have
> not; with special advantage to defendant in
> the competition because of the fact that it
> is not burdened with any part of the expense
> of gathering the news.  The transaction
> speaks for itself, and <u>a court of equity
> ought not to hesitate long in characterizing
> it as unfair competition</u> in business.

_____

        [27]  In the Bible, that turn of phrase seems to be more a threat than a promise.  <u>See, e.g.</u>, <u>Galatians</u> 6:7: "God is not mocked, for whatever a man sows, that he will also reap."  <u>But cf.</u> <u>Leviticus</u> 23:22, setting forth circumstances under which persons are <u>forbidden</u> to reap where they have sown.

43

*Id.* at 239-40 (emphasis added).  This dicta has been absorbed by New York misappropriation law:

> New York courts have noted the incalculable variety of illegal practices falling within the unfair competition rubric, calling it a broad and flexible doctrine that depends more upon the facts set forth than in most causes of action.  It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another.  The tort is adaptable and capacious.

*Roy Exp. Co. Establishment of Vaduz, Liech. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (citation and alteration omitted).  And it has been reflected in the rhetoric of federal district courts applying New York law.  *See, e.g.*, *Fly I*, 700 F. Supp. 2d at 336 (quoting *INS*); *NBA v. Sports Team Analysis & Tracking Sys.* ("*NBA SDNY*"), 939 F. Supp. 1071, 1075 (S.D.N.Y. 1996) (quoting *INS*), *rev'd*, *NBA*, 105 F.3d 841.

The *NBA* Court also noted that the district court whose decision it was reviewing had "described New York misappropriation law as standing for the 'broader principle that property rights of commercial value are to be and will be protected from any form of commercial immorality'; that misappropriation law developed 'to deal with business malpractices offensive to the ethics of [] society'; and that the doctrine is 'broad and flexible.'"  *NBA*, 105 F. 3d at 851

44

(brackets in original) (quoting NBA SDNY, 939 F. Supp. at 1098-1110) (internal citation omitted). But Judge Winter explicitly rejected the notion that "hot news" misappropriation cases based on the disapproval of the perceived unethical nature of a defendant's ostensibly piratical acts survive preemption. The Court concluded that "such concepts are virtually synonymous [with] wrongful copying and are in no meaningful fashion distinguishable from infringement of a copyright. The broad misappropriation doctrine relied upon by the district court is, therefore, the equivalent of exclusive rights in copyright law." NBA, 105 F.3d at 851 (deeming preempted the broad theory of misappropriation embodied in Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483 (N.Y. County Sup. Ct. 1950), aff'd, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951)).

No matter how "unfair" Motorola's use of NBA facts and statistics may have been to the NBA -- or Fly's use of the fact of the Firms' Recommendations may be to the Firms -- then, such unfairness alone is immaterial to a determination whether a cause of action for misappropriation has been preempted by the Copyright Act.[28] The adoption of new technology that injures or

---

[28] It may nonetheless be worth noting the peculiar nature of the Recommendations insofar as they tend to be self-fulfilling prophecies. Irrespective of the quality of a particular report and Recommendation, the Recommendation alone is likely to move the market price of a security in the short term. See, e.g., Tony Mauro, Drug Company's Argument May Not Pass Smell Test, N.Y.

destroys present business models is commonplace.  Whether fair or not,[29] that cannot, without more, be prevented by application of

Law J., Jan. 11, 2011, at 1 (reporting on the oral argument before the United States Supreme Court in Matrixx Initiatives, Inc. v. Siracusano, No. 09-1156 (U.S. argued Jan. 10, 2011)). During the argument in Matrixx, a case about the materiality of an omitted statement under the securities laws, Chief Justice Roberts posited to the defendant's counsel:

> I'm an investor in [the defendant]. . . .  I worry whether my stock price is going to go down.  You can have some psychic come out and say [the drug] is going to cause a disease' with no support whatsoever, but if it causes the stock to go down 20 percent, it seems to me that's material.

Id. (internal quotation marks omitted); see also Fly I, 700 F. Supp. 2d at 322 (referring to a Firm's 2006 recommendation to purchase General Motors shares which, in the short term, moved the market for the shares, but would appear to have been an unfortunate long-term investment).

[29]  It is in the public interest to encourage and protect the Firms' continued incentive to research and report on enterprises whose securities are publicly traded, the businesses and industries in which they are engaged, and the value of their securities.  But under the Firms' business models, that research is funded in part by commissions paid by authorized recipients of Recommendations trading not only with the benefit of the Firms' research, but on the bare fact that, for whatever reason, the Recommendation has been (or is about to be) issued.  If construed broadly, the "hot news" misappropriation tort applied to the Recommendations alone could provide some measure of protection for the Firms' ability engage in such research and reporting. But concomitantly, it would ensure that the authorized recipients of the Recommendations would in significant part be profiting because of their knowledge of the fact of a market-moving Recommendation before other traders learn of that fact.  In that circumstance, the authorized recipient upon whose commissions the Firms depend to pay for their research activities would literally be profiting at the expense of persons from whom such knowledge has been withheld who also trade in the shares in question ignorant of the Recommendation.

46

the misappropriation tort.  Indeed, because the Copyright Act itself provides a remedy for wrongful copying, such unfairness may be seen as supporting a finding that the Act preempts the tort.  See id.

### iii. Narrowness of the Preemption Exception

The NBA panel repeatedly emphasized the "narrowness" of the "hot news" tort exception from preemption.  See id. at 843, 848, 851, 852 (using the word "narrow" or "narrowness" five times).  Although our discussion of preemption in NBA did not focus on the importance of maintaining the uniform nationwide scheme that the Copyright Act, with its 1976 preemption amendment, 17 U.S.C. § 301, provides, we later underscored it.  In Krause v. Titleserv, Inc., 402 F.3d 119, 123 (2d Cir. 2005), we declined to limit protection for copyrights held by "owners" of computer programs to those with formal title to such programs.  The first reason we gave was that title may depend on state law that differs from one state to another.

> The result would be to undermine some of the uniformity achieved by the Copyright Act. . . .  If [the relevant section of the Copyright Act] required formal title, two software users, engaged in substantively identical transactions might find that one is

None of this affects our analysis, nor do we offer a view of its legal implications, if any.  We note nonetheless that the Firms seem to be asking us to use state tort law and judicial injunction to enable one class of traders to profit at the expense of another class based on their court-enforced unequal access to knowledge of a fact -- the fact of the Firm's Recommendation.

47

liable for copyright infringement while the other is protected by [the section], depending solely on the state in which the conduct occurred. <u>Such a result would contradict the Copyright Act's "express objective of creating national, uniform copyright law by broadly preempting state statutory and common-law copyright regulation."</u> <u>Community for Creative Non-Violence v. Reid</u>, 490 U.S. 730, 740 (1989); <u>see also</u> 17 U.S.C. § 301(a).

<u>Id.</u> at 123 (emphasis added).

Indeed, central to the principle of preemption generally is the value of providing for legal uniformity where Congress has acted nationally. <u>See, e.g.</u>, <u>Paneccasio v. Unisource Worldwide, Inc.</u>, 532 F.3d 101, 113 (2d Cir. 2008) ("The purpose of ERISA preemption is to ensure that all covered benefit plans will be governed by unified federal law, thus simplifying life for employers administering plans in several states, because a patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation." (internal quotation marks and brackets omitted)).

This is a pressing concern when considering the "narrow" "hot news" misappropriation exemption from preemption. The broader the exemption, the greater the likelihood that protection of works within the "general scope" of the copyright and of the type of works protected by the Act will receive disparate treatment depending on where the alleged tort occurs and which state's law is found to be applicable.

48

The problem may be illustrated by reference to a recent case in the Southern District of New York. In *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454 (S.D.N.Y. 2009), the court sought to determine whether there was a difference between New York and Florida "hot news" misappropriation law in order for it to analyze, under choice-of-law principles, which state's law applied. Judge Castel observed that "[n]o authority has been cited to show that Florida recognizes a cause of action for hot news misappropriation. Then again, defendants have not persuasively demonstrated that Florida would not recognize such a claim."[30] *Id.* at 459-60.

It appears, then, that the alleged "hot news" misappropriation in *All Headline News Corp.* might have been permissible in New York but not in Florida. The same could have been said for the aggregation and publication of basketball statistics in *NBA*, and the same may be said as to the aggregation and publication of Recommendations in the case at bar. To the extent that "hot news" misappropriation causes of action are not preempted, the aggregators' actions may have different legal significance from state to state -- permitted, at least to some extent, in some; prohibited, at least to some extent, in others. It is this sort of patchwork protection that the drafters of the

---

[30] The court concluded that New York law applied, and that the plaintiffs had adequately pleaded a New York "hot news" misappropriation claim. *All Headline News*, 608 F. Supp. 2d at 458-61.

49

Copyright Act preemption provisions sought to minimize, and that counsels in favor of locating only a "narrow" exception to Copyright Act preemption.

### c. Three- and Five-Part "Tests"

Before concluding that the NBA's claim was preempted, the NBA panel set forth in its opinion -- twice -- a five-part "test" for identifying a non-preempted "hot news" misappropriation claim. The district court in this case, when applying NBA, structured its conclusions-of-law analysis around NBA's first iteration of the "test":

> We hold that the surviving "hot-news" INS-like claim is limited to cases where: (i) a plaintiff generates or gathers information at a cost; (ii) the information is time-sensitive; (iii) a defendant's use of the information constitutes free-riding on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened. We conclude that SportsTrax does not meet that test.

NBA, 105 F.3d at 845; see Fly I, 700 F. Supp. 2d at 334-35 (quoting the passage but omitting the first fifteen prefatory words). But the panel restated the five-part inquiry later in its opinion:

> In our view, the elements central to an INS claim are: (i) the plaintiff generates or collects information at some cost or expense,

50

see [Financial Information, Inc. v. Moody's Investors Serv., 808 F.2d 204, 206 (2d Cir. 1996) ("FII")]; INS, 248 U.S. at 240; (ii) the value of the information is highly time-sensitive, see FII, 808 F.2d at 209; INS, 248 U.S. at 231; Restatement (Third) Unfair Competition, § 38 cmt. c.; (iii) the defendant's use of the information constitutes free-riding on the plaintiff's costly efforts to generate or collect it, see FII, 808 F.2d at 207; INS, 248 U.S. at 239-40; Restatement § 38 at cmt. c.; McCarthy, § 10:73 at 10-139; (iv) the defendant's use of the information is in direct competition with a product or service offered by the plaintiff, FII, 808 F.2d at 209, INS, 248 U.S. at 240; (v) the ability of other parties to free-ride on the efforts of the plaintiff would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened, FII, 808 F.2d at 209; Restatement, § 38 at cmt. c.; INS, 248 U.S. at 241 ("[INS's conduct] would render [AP's] publication profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return.").

NBA, 105 F.3d at 852.

Throughout this litigation the parties seem to have been in general agreement that the district court and we should employ a five-part analysis taken from the NBA opinion. It is understandable, of course, that counsel and the district court did in this case, and do in other comparable circumstances, attempt to follow our statements in precedential opinions as to what the law is -- which we often state in terms of what we "hold." But that reading is not always either easy to make or technically correct. As Judge Friendly put it in colorful terms:

"A judge's power to bind is limited to the issue that is before him; he cannot transmute dictum into decision by waving a wand and uttering the word 'hold.'"  United States v. Rubin, 609 F.2d 51, 69 (2d Cir. 1979) (Friendly, J., concurring), quoted in Pierre N. Leval, Judging Under the Constitution:  Dicta about Dicta, 81 N.Y.U. L. Rev. 1249, 1249 (2006).  See also generally Leval, supra (containing seminal discussion of judicial use of the term "holding"); id. at 1256 ("A dictum [i.e., a conclusion or point of view in an opinion that is not a holding] is an assertion in a court's opinion of a proposition of law [that] does not explain why the court's judgment goes in favor of the winner."); Judith M. Stinson, Why Dicta Becomes Holding and Why it Matters, 76 Brook. L. Rev. 219, 219 n.2 (2010) (collecting authorities addressing difficulties with judicial use of the term "hold").[31]

---

[31]  Of course, the term "we hold" can be (and often is) used unexceptionably to describe what the outcome of a particular case before a panel is:  To use a hypothetical example not far removed from the facts of this case, "We hold that the district court abused its discretion in granting the temporary injunction here." See also, e.g., Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 419 (2d Cir. 2009) ("[W]e hold that the conduct of Douglas, Lug, Weber, and Williams raises a genuine issue of material fact as to whether they implicitly but affirmatively sanctioned abuse of Okin by Roy Sears, and that those defendants, if found liable, would not be entitled to qualified immunity."); Conyers v. Rossides, 558 F.3d 137, 138 (2d Cir. 2009) ("[W]e hold that defendant is entitled to judgment on the pleadings with respect to plaintiff's Veterans Employment Opportunities Act and constitutional claims.  We therefore affirm.").

It is axiomatic that appellate judges cannot make law except insofar as they reach a conclusion based on the specific facts and circumstances presented to the court in a particular appeal. Subordinate courts and subsequent appellate panels are required to follow only these previous appellate legal "holdings." The NBA panel decided the case before it, and we think that the law it thus made regarding "hot news" preemption is, as we have tried to explain, determinative here. But the Court's various explanations of its five-part approach are not.[32]

---

[32] Indeed, rather than identifying a set of required and specific "extra elements" essential to a non-preempted INS-like "hot news" claim, the Court in NBA was opining about the hypothetical set of circumstances -- not present in that case -- that might give rise to such a claim. Because the NBA Court concluded that no such claim could be established on the facts of that case because of the absence of free-riding, its conjecture was descriptive and a helpful window into its reasoning, but could not bind subsequent courts.

The NBA Court's approach, then, was similar to that of the Supreme Court in Sosa v. Alvarez-Machain, 542 U.S. 692, 729-30 (2004), albeit in a decidedly different context. There, the plaintiff, who had been seized in Mexico by a group of Mexican nationals working for the United States Drug Enforcement Agency and held overnight in Mexico before being transferred to the custody of American law enforcement officers in Texas, brought suit against, inter alios, the Mexican nationals, pursuant to the Alien Tort Claims Act (also commonly called the Alien Tort Statute) (the "ATS"), 28 U.S.C. § 1350, alleging that his seizure violated the law of nations. Alvarez-Machain, 542 U.S. at 697-98. The Supreme Court concluded that Alvarez-Machain could not state a claim under the ATS because his asserted claim did not fall within the "very limited category [of claims] defined by the law of nations and recognized at common law" as covered by that statute. Id. at 712.

Justice Souter, writing for the Court, however, was emphatic that the Court did not intend, by its opinion, to "close the door to further independent judicial recognition of

53

Indeed, we do not see how they can be: The two five-part "tests" are not entirely consistent, and are less consistent still with the three-"extra element" test, which also appears later in the opinion:

> We therefore find the extra elements -- those in addition to the elements of copyright infringement -- that allow a "hotnews" claim to survive preemption are: (i) the time-sensitive value of factual information, (ii) the free-riding by a defendant, and (iii) the threat to the very existence of the product or service provided by the plaintiff."

Id. at 853.

For example, the fifth of the five factors in the first iteration of the test is that "the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened." NBA, 105 F.3d at 845 (emphasis added). The second iteration is similar, but adds a quotation from INS which can be read to make

---

actionable international norms" under the ATS. Id. at 729. Instead, the Court made clear that in later cases, the "judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." Id.

Analogously, in NBA, the Court held that the facts of that case could not support a non-preempted "hot news" claim. Its language regarding the elements that might in some later case allow a claim to avoid preemption, and its discussion of why such an exception to preemption was narrow, were useful commentaries on the reasoning and possible implications of the Court's holding. But the language itself was not meant to, and did not, bind us, the district court, or any other court to subsequently consider this subject.

54

the factor far more difficult to demonstrate: that the conduct "would render [the plaintiff's] publication profitless, or so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison with the return.'" Id. at 852 (emphasis added) (quoting INS, 248 U.S. at 241). Then, in rehearsing the "extra elements" that may avoid preemption, the panel referred to "the threat to the very existence of the product or service provided by the plaintiff." Id. at 853 (emphasis added).

The distinctions between these various statements of a multi-part test are substantial. Were we required to rule on the district court's findings of fact ourselves in light of these various versions of elements, we might well perceive no clear error in a finding that the existence or quality, id. at 845, of the Firms' reports were placed in jeopardy by what the district court found to be "free riding." By contrast, we might otherwise conclude that there is insufficient record evidence to sustain a finding either that the alleged free-riding by Fly and similar aggregators "in effect . . . cut off the [Firms'] service by rendering the cost prohibitive in comparison with the return," id. at 852, or were a "threat to the very existence of the product or service provided by the plaintiff[s]," id. at 853.[33]

_____

[33] The Firms' seek to use the multiplicity of the factors-lists to their advantage. On page 46 of their brief, they assert:

It seems to us that each of NBA's three multi-element statements serves a somewhat different purpose.  The first is a general introduction, by way of summary, of what the decision concludes.  The second may be described as "stating the elements of the tort."  Confold Pac., Inc. v. Polaris Indus., 433 F.3d 952, 960 (7th Cir. 2006) (Posner, J.).  And the third focuses on what "extra elements" are necessary to avoid preemption despite the conclusion that the "general scope requirement" and the "subject matter requirement," NBA, 105 F.3d at 848, have been met.

In our view, the several NBA statements were sophisticated observations in aid of the Court's analysis of the

---

> [A]s this Court found in NBA, "hot news"
> misappropriation contains three [extra
> elements to avoid preemption]: (1) time
> sensitivity; (2) free riding; and (3) threat
> to existence or quality of the product or
> service offered by the plaintiff.  NBA, 105
> F.3d at 845, 853.

Appellees Br. at 46 (emphasis added).  What the NBA Court in fact
said in this context, at the second cited page,  was:

> We therefore find the extra elements -- those
> in addition to the elements of copyright
> infringement -- that allow a "hot news" claim
> to survive preemption are: (i) the
> time-sensitive value of factual information,
> (ii) the free-riding by a defendant, and
> (iii) the threat to the very existence of the
> product or service provided by the plaintiff.

NBA, 105 F.3d at 853 (emphasis added).  By mixing two different
iterations of the factors, one id. at 845, and one id. at 853,
the Firms thus set forth an easier test for them to meet to avoid
preemption than is actually articulated in NBA.

56

difficult preemption issues presented to it.  See Leval, supra, at 1254.  Inconsistent as they were, they could not all be equivalent to a statutory command to which we or the district court are expected to adhere.[34]

We engage in this somewhat extended discussion because the parties agreed that the district court should employ the five-part analysis derived NBA, and the district court did so. But we cannot supplant this Court's view of the law with the view of the parties.  See, e.g., Kamen v. Kemper Fin. Servs. Inc., 500 U.S. 90, 99 (1991); Hankins v. Lyght, 441 F.3d 96, 104 (2d Cir. 2006); Becker v. Poling Transp. Corp., 356 F.3d 381, 390 (2d Cir. 2004).

### 2.  NBA Preemption Analysis Applied to The NBA Facts

Applying the principles of preemption it had identified, the NBA Court concluded that the tort claim that the NBA sought to assert against Motorola and STATS was preempted by the Copyright Act because, the "general scope requirement" and the "subject matter requirement" having been satisfied, the "extra elements" necessary for such a claim nonetheless to survive preemption were absent.  This was so despite the fact

---

[34]  See supra note 31.  See also generally, Leval, supra, 81 N.Y.U. L. Rev at 1256-58; id. at 1256 (Dictum is "an assertion in a court's opinion of a proposition of law which does not explain why the court's judgment goes in favor of the winner.  If the court's judgment and the reasoning which supports it would remain unchanged, regardless of the proposition in question, that proposition plays no role in explaining why the judgment goes for the winner.  It is superfluous to the decision and is dictum.").

that Motorola and STATS were indeed disseminating, on a timely basis, information about NBA games that the NBA was also circulating.[35]  The Court concluded that:

> An indispensable element of an INS "hot news" claim is free-riding by a defendant on a plaintiff's product, enabling the defendant to produce a directly competitive product for less money because it has lower costs. . . . Appellants are in no way free-riding on [the NBA service that provided game statistics to the public].  Motorola and STATS expend their own resources to collect purely factual information generated in NBA games to transmit to [Motorola] pagers.  They have their own network and assemble and transmit data themselves.

> To be sure, if appellants in the future were to collect facts from an enhanced [NBA] pager to retransmit them to [Motorola's] pagers, that would constitute free-riding and might well cause [the NBA service] to be unprofitable because it had to bear costs to collect facts that [Motorola] did not.  If the appropriation of facts from one pager to another pager service were allowed, transmission of current information on NBA games to pagers or similar devices would be substantially deterred because any potential transmitter would know that the first entrant would quickly encounter a lower cost competitor free-riding on the originator's transmissions.

---

[35]  The Court identified the NBA's "primary products" as the "producing [of] basketball games with live attendance and licensing [of] copyrighted broadcasts of those games," and concluded that there was "no evidence that anyone regards [the defendants' products] as a substitute for attending NBA games or watching them on television."  NBA, 105 F.3d at 853-54.  In the panel's view, the NBA's "collection and retransmission of strictly factual material about the [basketball] games," was not the NBA's primary product, and, in any event, SportsTrax was not free riding off of the NBA by engaging in its own collection and retransmission of the factual information.  Id. at 853.

> However, that is not the case in the instant matter. [Motorola] and [the NBA] are each bearing [its] own costs of collecting factual information on NBA games, and, if one produces a product that is cheaper or otherwise superior to the other, that producer will prevail in the marketplace. This is obviously not the situation against which INS was intended to prevent: the potential lack of any such product or service because of the anticipation of free-riding.

NBA, 105 F.3d at 854 (footnote omitted).

B.   Preemption and This Appeal

We conclude that applying NBA and copyright preemption principles to the facts of this case, the Firms' claim for "hot news" misappropriation fails because it is preempted by the Copyright Act.  First, the Firms' reports culminating with the Recommendations satisfy the "subject matter" requirement because they are all works "of a type covered by section[] 102," i.e., "original works of authorship fixed in a[] tangible medium of expression."  17 U.S.C. § 102.  As discussed above, it is not determinative for the Copyright Act preemption analysis that the facts of the Recommendations themselves are not copyrightable.  See NBA, 105 F.3d at 850.  Second, the reports together with the Recommendations fulfill the "general scope" requirement because the rights "may be abridged by an act which, in and of itself, would infringe one of the exclusive rights' provided by federal copyright law," Altai, Inc., 982 F.2d at 716 (citing Harper & Row, 723 F.2d at 200), i.e., "acts of reproduction, performance, distribution or display," id. (internal quotation marks omitted).

59

Third and finally, the Firms' claim is not a so-called INS-type non-preempted claim because Fly is not, under NBA's analysis, "free-riding."  It is collecting, collating and disseminating factual information -- the facts that Firms and others in the securities business have made recommendations with respect to the value of and the wisdom of purchasing or selling securities -- and attributing the information to its source.  The Firms are making the news; Fly, despite the Firms' understandable desire to protect their business model, is breaking it.[36]  As the INS Court explained, long before it would have occurred to the Court to cite the First Amendment for the proposition:

> [T]he news element -- the information respecting current events contained in the literary production -- is not the creation of the writer, but is a report of matters that ordinarily are publici juris; it is the

---

[36] For purposes of evaluating its behavior, at least, INS was not "breaking" news in this sense.  It was not reporting on news AP was making by itself reporting news -- e.g., "The Associated Press and major news networks reported late Sunday that President Obama plans to nominate Solicitor General Elena Kagan to replace retiring Supreme Court Justice John Paul Stevens."  Maureen Hoch, Reports: President Obama to Name Elena Kagan as Supreme Court Pick, PBS Newshour (May 9, 2010, 11:08 PM) available at http://www.pbs.org/newshour/rundown/ 2010/05/reports-obama-to-name-elena-kagan-as-supreme-court-pick.h tml (latest visit Mar. 7, 2011) -- let alone making news -- e.g., "Tamer Fakahany, an assistant managing editor at the AP's Nerve Center in New York, has been named deputy managing editor overseeing the center at AP headquarters."  Tamer Fakahany Named AP Deputy Managing Editor, Associated Press, Feb. 8, 2011, available at http://www.cnbc.com/id/41478155 (latest visit Mar. 7, 2011).  By significant contrast, in INS, AP broke news, and INS repackaged that news as though it were "breaking" news of its own.

history of the day. It is not to be supposed that the framers of the Constitution, when they empowered Congress "to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries" (Const., Art I, § 8, par. 8), intended to confer upon one who might happen to be the first to report a historic event the exclusive right for any period to spread the knowledge of it.

INS, 248 U.S. at 234.

The use of the term "free-riding" in recent "hot news" misappropriation jurisprudence exacerbates difficulties in addressing these issues. Unfair use of another's "labor, skill, and money, and which is salable by complainant for money," INS, 248 U.S. at 239, sounds like the very essence of "free-riding," and, the term "free-riding" in turn seems clearly to connote acts that are quintessentially unfair.

It must be recalled, however, that the term free-riding refers explicitly to a requirement for a cause of action as described by INS. As explained by the NBA Court, "[a]n indispensable element of an INS 'hot news' claim is free-riding by a defendant on a plaintiff's product." NBA, 105 F.3d at 854.

The practice of what NBA referred to as "free-riding" was further described by INS. The INS Court defined the "hot news" tort in part as "taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and . . . appropriating it and selling it as [the

61

defendant's] own . . . ." _INS_, 248 U.S. at 239. That definition fits the facts of _INS_: The defendant was taking news gathered and in the process of dissemination by the Associated Press and selling that news as though the defendant itself had gathered it. But it does not describe the practices of Fly. The Firms here may be "acquiring material" in the course of preparing their reports, but that is not the focus of this lawsuit. In pressing a "hot news" claim against Fly, the Firms seek only to protect their Recommendations, something they _create_ using their expertise and experience rather than _acquire_ through efforts akin to reporting.

Moreover, Fly, having obtained news of a Recommendation, is hardly selling the Recommendation "as its own," _INS_, 248 U.S. at 239. It is selling the information with specific attribution to the issuing Firm. Indeed, for Fly to sell, for example, a Morgan Stanley Recommendation "as its own," as INS sold the news it cribbed from AP to INS subscribers, would be of little value to either Fly or its customers. If, for example, Morgan Stanley were to issue a Recommendation of Boeing common stock changing it from a "hold" to a "sell," it hardly seems likely that Fly would profit significantly from disseminating an item reporting that "_Fly_ has changed its rating of Boeing from a hold to a sell." It is not the identity of Fly and its reputation as a financial analyst that carries the authority and weight sufficient to affect the market. It is

62

Fly's accurate attribution of the Recommendation to the creator that gives this news its value.

We do not perceive a meaningful difference between (a) Fly's taking material that a Firm has <u>created</u> (not "acquired") as the result of organization and the expenditure of labor, skill, and money, and which is (presumably) salable by a Firm for money,[37] and selling it <u>by ascribing the material to its creator Firm</u> and author (not selling it as Fly's own), and (b) what appears to be unexceptional and easily recognized behavior by members of the traditional news media -- to report on, say, winners of Tony Awards or, indeed, scores of NBA games with

---

[37] The Firms do not sell their Recommendations for money. We understand this to be in keeping with their business model, under which the Firms are compensated through commissions for executing trades for clients. But we assume that the Firms could sell the Recommendations, were they so inclined.

proper attribution of the material to its creator.[38]  INS did not purport to address either.

It is also noteworthy, if not determinative, that INS referred to INS's tortious behavior as "amount[ing] to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not . . . ."  Id. at 240 (emphases added).  As we have seen, the point at which the Firms principally reap their profit is upon the execution of sales or purchases of securities.  It is at least arguable that Fly's interference with the "normal operation" of the Firms' business is indeed at a "point" where the Firms' profits are reaped.  But it is not at all clear that

---

[38]  Another analogue that comes readily to mind is the regular practice of members of the news media -- traditional and otherwise -- to report on political endorsements by the editorial boards of competitors.  The fact that the New York Times endorses a particular candidate seems to us to be news.  When the newspaper publishes its endorsement, that fact is widely reported, without controversy so far as we know, by other news outlets.  See, e.g., Shailagh Murray, Lieberman's Eroding Base, Wash. Post, July 30, 2006, at A4 ("In an editorial published today, the New York Times endorsed [Ned] Lamont over [Senator Joseph] Lieberman [for a U.S. Senate seat in Connecticut], arguing that the senator had offered the nation a 'warped vision of bipartisanship' by supporting [President] Bush on national security."); John Harwood, Edwards Plies Limited Resources, Wall St. J., Feb. 27, 2004, at A4 (reporting on the endorsement of Senator John Kerry for the Democratic presidential nomination by the New York Times); Major Newspapers Reveal Their Favorite Candidates, L.A. Times, Oct. 23, 2000, at A14 (describing and quoting from various major newspapers' endorsements during the 2000 U.S. Presidential election).

that profit is being in any substantial sense "diverted" to Fly by its publication of Recommendations news. The lost commissions are, we would think, diverted to whatever broker happens to execute a trade placed by the recipient of news of the Recommendation from Fly.

To be sure, as the district court pointed out, "Fly [has made efforts], which have met with some success, to link its subscribers to discount brokerage services." Fly I, 700 F. Supp. 2d at 340 (emphasis added). The court viewed these steps as "reflect[ing] the final stage in [Fly's] direct competition with the Firms by leveraging its access to their Recommendations and driving away their commission revenue[s]." Fly I, 700 F. Supp. 2d at 340.

But we see nothing in the district court's opinion or in the record to indicate that the so-called "final stage" has in fact matured to a point where a significant portion of the diversion of profits to which the Firms object is lost to brokers in league with Fly or its competitors. Firm clients are, moreover, free to employ their authorized knowledge of a Recommendation to make a trade with a discount broker for a smaller fee. And, as we understand the record, the Firms channel fees to their brokerage operations using a good deal more than their Recommendations alone. A non-public Firm report, quite apart from the attached Recommendation -- by virtue of the otherwise non-public information the report contains, including

65

general news about the state of the markets, securities, and economic conditions -- seems likely to play a substantial part in the Firms' ability to obtain trading business through their research efforts. It is difficult on this record for us to characterize Fly's publication of Recommendations as an unauthorized interference with the normal operation of Firms' legitimate business precisely at the point where the profit is to be reaped which, directly or indirectly, diverts a material portion of the Firms' profits from the Firms to Fly and others engaged in similar practices. See INS, 248 U.S. at 240.

We do not mean to be parsing the language of INS as though it were a statement of law the applicability of which determines the outcome of this appeal. As we have explained, the law that INS itself established was overruled many years ago. But in talking about a "'hot-news' INS-like claim," as we did in NBA, 105 F.3d at 845, or "the INS tort," as the district court did in this case, Fly I, 700 F. Supp. 2d at 336, we are mindful that the INS Court's concern was tightly focused on the practices of the parties to the suit before it: news, data, and the like, gathered and disseminated by one organization as a significant part of its business, taken by another entity and published as the latter's own in competition with the former. The language chosen by the INS Court seems to us to make clear the substantial difference distance between that case and this one.

Here, like the defendants in NBA and unlike the defendant in INS, Fly "[has its] own network and assemble[s] and transmit[s] data [it]sel[f]." NBA, 105 F.3d at 854. In NBA, Motorola and STATS employees watched basketball games, compiled the statistics, scores, and other information from the games, and sold the resulting package of data to their subscribers. We could perceive no non-preempted "hot news" tort. Here, analogous to the defendant's in NBA, Fly's employees are engaged in the financial-industry equivalent of observing and summarizing facts about basketball games and selling those packaged facts to consumers; it is simply the content of the facts at issue that is different.

And, according to our decision in NBA: "An indispensable element of a[ non-preempted] INS 'hot-news' claim is free-riding by a defendant on a plaintiff's product, enabling the defendant to produce a directly competitive product for less money because it has lower costs." See id. In NBA, we concluded that the defendant's SportsTrax service was not such a product, in part because it was "bearing [its] own costs of collecting factual information on NBA games." Id. In this case, as the district court found, approximately half of Fly's twenty-eight employees are involved on the collection of the Firms' Recommendations and production of the newsfeed on which summaries of the Recommendations are posted. Fly I, 700 F. Supp. 2d at 325. Fly is reporting financial news -- factual information on

Firm Recommendations -- through a substantial organizational effort. Therefore, Fly's service -- which collects, summarizes, and disseminates the news of the Firms' Recommendations -- is not the "INS-like" product that could support a non-preempted cause of action for misappropriation.

By way of comparison, we might, as the NBA Court did, see id., 105 F.3d at 854, speculate about a product a Firm might produce which might indeed give rise to an non-preempted "hot-news" misappropriation claim. If a Firm were to collect and disseminate to some portion of the public facts about securities recommendations in the brokerage industry (including, perhaps, such facts it generated itself -- its own Recommendations), and were Fly to copy the facts contained in the Firm's hypothetical service, it might be liable to the Firm on a "hot-news" misappropriation theory.[39] That would appear to be an INS-type claim and might survive preemption.[40] See also, e.g., All

_____

[39] The district court pointed out that in October 2007, while this suit was pending and "settlement talks in this action were ongoing," Fly brought a "hot news" misappropriation suit against a competitor, its competitor TradeTheNews.com. See Fly I, 700 F. Supp. 2d at 327-28. We find no legal significance in that fact. It hardly constitutes a concession that the present suit is meritorious. Fly could raise a creditable argument that its lawsuit based on the copying of facts from its service by a similar, competing service is closer to the hypothetically valid "hot news" causes of action referred to in NBA, 105 F.3d at 854, and here, than is the Firms' claim against Fly.

[40] Judge Raggi writes that by distinguishing between those who make the news and those who break it, we "foreclose the possibility of a 'hot news' claim by a party who disseminates news it happens to create." Post at **[12].** That issue is simply

68

Headline News Corp., 608 F. Supp. 2d at 454 (suggesting, in a case presenting facts more closely analogous to INS, that the plaintiff may have had a non-preempted "hot news" cause of action).  See generally Complaint (Dkt. No. 1), AP v. All Headline News Corp., No. 08-cv-323 (S.D.N.Y. Jan. 14, 2008).  But the Firms have no such product and make no such claim.  On the facts of this case, they do not have an "INS-like" non-preempted "hot news" misappropriation cause of action against Fly.

C.  Judge Raggi's Concurrence

Judge Raggi would reach the same outcome as do we, but "would apply the NBA test to this case and reverse on the ground that the Firms failed to satisfy its direct competition requirement for a non-preempted claim."  Post, at **[12]**.  We express no opinion as to whether there is or was direct competition between the Firms and Fly with regard to the Recommendations because we are bound by the holding of NBA.  On the facts of that case, the plaintiff's cause of action was preempted by the copyright law because the defendants did not "free ride" on the plaintiff's work product.[41]  The NBA panel did

---

not before us.  We therefore do not address it, let alone suggest or imply that such a claim would necessarily be foreclosed.  See ante at **[59-60]**.

[41]  To reiterate:

> SportsTrax and Gamestats are each bearing
> their own costs of collecting factual
> information on NBA games, and, if one

69

not decide the case before it on the basis of the presence or absence of direct competition, which it thought to be an element of the preemption inquiry but did not depend upon in its analysis. We think that the <u>NBA</u> panel's decision that the absence of "free riding" was fatal to the plaintiff's claim in that case is binding upon us on the facts presented here. In other words, even were we to conclude, hypothetically and contrary to Judge Raggi's views, that there <u>was indeed</u> direct competition between the Firms and Fly with respect to the

> produces a product that is cheaper or otherwise superior to the other, that producer will prevail in the marketplace. This is obviously not the situation against which INS was intended to prevent: the potential lack of any such product or service because of the anticipation of free-riding.
>
> For the foregoing reasons, the NBA has not shown any damage to any of its products based on free-riding by Motorola and STATS, and the NBA's misappropriation claim based on New York law is preempted.

<u>NBA</u>, 105 F. 3d at 854; <u>see also</u> <u>id.</u> at 854 n.9:

> It may well be that the NBA's product, when enhanced, will actually have a competitive edge because its Gamestats system will apparently be used for a number of in-stadium services as well as the pager market, resulting in a certain amount of cost-sharing. Gamestats might also have a temporal advantage in collecting and transmitting official statistics. Whether this is so does not affect our disposition of this matter, although it does demonstrate the gulf between this case and INS, where the free-riding created the danger of no wire service being viable.

70

Recommendations, we would nonetheless be bound to reverse the judgment of the district court based on our reading of <u>NBA</u>.  The presence or absence of direct competition is thus not determinative and is therefore a matter we are not called upon to decide here.

## CONCLUSION

We conclude that in this case, a Firm's ability to make news -- by issuing a Recommendation that is likely to affect the market price of a security -- does not give rise to a right for it to control who breaks that news and how.  We therefore reverse the judgment of the district court to that extent and remand with instructions to dismiss the Firms' misappropriation claim.

REENA RAGGI, Circuit Judge, concurring:

I join the court in reversing the judgment in favor of the Firms on their state law claims of "hot news" misappropriation on the ground that such claims are preempted by federal copyright law. See 17 U.S.C. § 301. Unlike my colleagues in the majority, I do not reject the five-part test enunciated in National Basketball Association v. Motorola, Inc., 105 F.3d 851 (2d Cir. 1997) ("NBA"), to reach this result. Whatever reservations I may have about that test as a means for identifying non-preempted "hot news" claims, I do not think it can be dismissed as dictum. Accordingly, I write separately to explain why I conclude that the Firms failed to satisfy the "direct competition" requirement of NBA's test.

1.     The Firms' Claims Satisfy the Subject Matter Requirement for Federal Copyright Preemption

At the outset, I note my agreement with the majority's conclusion that the Firms' claims satisfy the subject matter requirement for copyright preemption of state law. See ante at **[37-40, 60]**. The written research reports containing the Recommendations are certainly "within the type of works protected by" §§ 102 and 103 of the Copyright Act. Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004); see also 17 U.S.C. § 301(a), (b)(1). Moreover, although the Recommendations are uncopyrightable opinions, see 17 U.S.C. § 102(b); Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 978 (2d Cir. 1980) (noting that copyright does not protect ideas or interpretations of facts), § 301 preempts claims regarding the "uncopyrightable as well as copyrightable elements" within the protected reports, NBA, 105 F.3d at 849-50. Thus, while the Firms can invoke copyright law

1

to prevent Fly from copying the original expression of their ideas, and indeed have successfully done so in this case, they cannot avoid preemption by seeking state law protection only for the non-copyrightable Recommendations.

This conclusion obtains from Congress's considered choices (1) to withhold copyright protection for ideas but, nevertheless, (2) to preempt that which falls within the subject matter of copyright rather than only what is protected by copyright.  See 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 19D.03[A][2][b], at 19D-28 (2010) (noting Congress's "policy decision" not to protect ideas with copyright); 5 William F. Patry, Patry on Copyright §§ 18:14-18:15, at 18-49 to 18-53 (2011) (noting that § 301 refers to subject matter of copyright referenced in § 102, which section describes what is and is not copyrightable, rather than only works protected by copyright).  The fact that the Recommendations are valuable in part because they are authored by the Firms, which have made a "substantial investment" in building reputations for producing high quality research, Barclays Capital Inc. v. Theflyonthewall.com, 700 F. Supp. 2d 310, 319 (S.D.N.Y. 2010), does not change the result.  Even if Fly's distribution of Recommendations might be viewed as a misappropriation of the Firms' goodwill, such claims are preempted for the reasons discussed infra at **[4-9]**.  See 5 Patry, supra, § 18:39, at 18-129 (noting that claims for misappropriation of goodwill are preempted); see also Marvullo v. Gruner + Jahr AG & Co., No. 98Civ5000, 2001 WL 40772, at *7 (S.D.N.Y. Jan. 17, 2001) (dismissing claim of misappropriation "designed to trade" on "popularity and goodwill" as preempted (internal quotation marks omitted)).

To be sure, legal theories other than copyright might protect the Firms' trademarks or prevent confusion regarding the Recommendations' origins. See, e.g., 15 U.S.C. § 1114(1) (imposing liability for use or imitation of registered marks "likely to cause confusion," mistake, or deception); id. § 1125(a)(1)(A) (imposing liability for use of "any false designation of origin," or misleading representations "likely to cause confusion . . . as to the origin, sponsorship, or approval" of goods). But the Firms do not allege that Fly passed off its own financial advice as that of the Firms or misrepresented that the Recommendations originated with Fly. Cf. Warner Bros. Inc. v. Am. Broad. Cos., 720 F.2d 231, 247 (2d Cir. 1983) (noting non-preemption of unfair competition claims based on "passing off"). To the extent the Firms seek to protect their Recommendations from dissemination, a subject preempted but not protected by federal copyright law, they must seek relief from Congress rather than the courts.

2.    The Firms' Claims Satisfy the General Scope Requirement for Preemption Under *NBA*

I also agree with the majority's determination that the Firms' claims satisfy § 301's general scope requirement because the Firms seek to vindicate rights "that may be abridged by an act which, in and of itself, would infringe one of the exclusive rights provided by federal copyright law." Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992) (internal quotation marks omitted); see ante at **[40-41, 60]**. In reaching this conclusion, the majority dismisses the five-part test enunciated in NBA as dictum and identifies other factors distinguishing this case from International News Service v.

3

Associated Press, 248 U.S. 215 (1918) ("INS"). See ante at **[51-58, 60-69]**. Although I too have reservations about NBA's test – specifically, whether it in fact identifies "extra elements" qualitatively different from those rights protected exclusively by copyright to avoid preemption – I am not convinced that the standard can be dismissed as dictum. In any event, we need not do so in this case because the Firms failed to satisfy the direct competition requirement of NBA's test.

        a.      *NBA*'s Test May Not Identify Elements Qualitatively Different from Exclusive Rights Protected by Copyright

Having disclosed reservations as to NBA's test, I briefly explain them.

States originally exercised concurrent power over copyright as long as their laws did not conflict with federal statutory protections. See Goldstein v. California, 412 U.S. 546, 560-61 (1973); Roth v. Pritikin, 710 F.2d 934, 938 (2d Cir. 1983) (noting "dual system" in which federal law regulated published works while state common law protected unpublished material). The Copyright Act of 1976 ended this "unwieldy" arrangement by implementing a "uniform system of copyright protection," Roth v. Pritikin, 710 F.2d at 938, and expressly preempting certain state laws respecting "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106," 17 U.S.C. § 301(a); see Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 305.

To identify rights "equivalent" to those protected by copyright, courts apply an "extra elements" test that saves from federal preemption claims requiring elements "instead of or in addition to the acts of reproduction, performance, distribution or display." Computer

4

Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d at 716 (internal quotation marks omitted); see 1 Nimmer, supra, § 1.01[B][1], at 1-12 to 1-14. This test is satisfied, however, only if extra elements change "the nature of the action so that it is qualitatively different from a copyright infringement claim." Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d at 716 (internal quotation marks omitted; emphasis in original). Put another way, elements that limit "the scope of the claim but leave[] its fundamental nature unaltered" do not prevent preemption. Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 306-07; see Mayer v. Josiah Wedgwood & Sons, Ltd., 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985) (stating that elements altering "action's scope but not its nature" are insufficient to avoid preemption). For example, claims based on breaches of fiduciary duty, contractual promises of confidentiality, or trade secrets often survive preemption because "the underlying right they seek to vindicate is the right to redress violations of" a particular duty or promise different from an exclusive right protected by copyright. Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 307; see also Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir. 1993); 1 Nimmer, supra, § 1.01[B][1][a][i], at 1-15 to 1-16 (stating that claims for breaches of contractual confidentiality provisions are not preempted).[1] In contrast, unfair competition,

---

[1] Thus, the Firms might protect their authorized clients' valuable "informational advantage," Barclays Capital Inc. v. Theflyonthewall.com, 700 F. Supp. 2d at 316, by bringing contract actions against clients or employees who disseminate Recommendations in violation of confidentiality agreements. Moreover, to the extent Fly or similar companies induce such breaches, a tortious interference of contract claim might provide redress. See 1 Nimmer, supra, § 1.01[B][1][a][ii], at 1-18 n.96 (noting that contract interference claims based on "activity other than unauthorized reproduction, distribution, performance, etc." avoid preemption). Such claims were notably unavailable in INS, where the value of the

5

misappropriation, or unjust enrichment claims are preempted when based on alleged acts such as distribution or reproduction, despite required elements of intent, enrichment, or commercial immorality.  See, e.g, Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d at 306-07 (concluding that "enrichment element," like intent or awareness, limited claim's scope but left its "fundamental nature unaltered"); Financial Info., Inc. v. Moody's Investors Serv., Inc., 808 F.2d 204, 208 (2d Cir. 1986) (concluding unfair competition claim preempted despite requirement of "commercial immorality" (internal quotation marks omitted)).[2]

In NBA, this court applied the "extra element" test to determine "the extent to which a 'hot news' misappropriation claim," originally identified by the Supreme Court in INS prior to the Copyright Act of 1976, avoided § 301 preemption.  See 105 F.3d at 850-51.  In

---

plaintiff's news lay in public dissemination rather than secrecy.  See 248 U.S. at 235 (emphasizing that the "peculiar value of news is in the spreading of it while it is fresh").

[2] Precisely because the Copyright Act preempts only state claims regarding rights equivalent to those protected by copyright, I do not share the majority's "pressing concern" regarding the potential for disparate state law "hot news" doctrines.  Ante at **[48-51]**.  To be sure, § 301 prevents states from expanding or contracting federal copyright law.  See NBA, 105 F.3d at 849; Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d at 716.  But there is nothing alarming about states adopting differing versions of non-preempted legal theories that protect rights qualitatively different from those addressed by copyright.

I similarly identify nothing troubling with the use of state tort law or a judicial injunction to maintain the Firms' informational advantage at the expense of other traders.  See ante at **[47-48 n.29]**.  Courts routinely enforce non-preempted state laws that protect one company's exclusive use of information.  See, e.g., Russo v. Ballard Med. Prods., 550 F.3d 1004, 1014-16 (10th Cir. 2008) (upholding jury verdict for trade secret misappropriation and breach of confidentiality agreement when claims not preempted by patent law); Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d at 717-21.

The issue presented on appeal is thus whether the Firms' claims are preempted, not the similarity of states' "hot news" doctrines or the perceived commercial morality of a company profiting from an informational advantage.

concluding that "some form" of "hot news" claim was not preempted, <u>NBA</u> relied first on a House Report to the 1976 Act stating that "'state law should have the flexibility to afford a remedy . . . against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting 'hot' news, whether in the traditional mold'" of <u>INS</u> "'or in the newer form of data updates from scientific, business, or financial data bases.'" <u>Id.</u> at 850 (quoting H.R. Rep. No. 94-1476, at 132 (1976)); <u>see id.</u> (citing <u>Financial Info., Inc. v. Moody's Investors Serv., Inc.</u>, 808 F.2d at 209 (relying on House Report in noting that "hot news" claims not preempted)).

Although this legislative history is some evidence that Congress did not intend federal copyright law to preempt all "hot news" claims, the scope of that intent is not easily discerned. The House Report references an <u>earlier</u> version of the 1976 Act containing examples of non-preempted actions, including "rights against misappropriation not equivalent to" the exclusive § 106 rights, "breaches of contract, breaches of trust . . . and deceptive trade practices such as passing off and false representation." H.R. Rep. No. 94-1476, at 24; <u>see also</u> 5 Patry, <u>supra</u>, § 18:8, at 18-21 to 18-27. After the Justice Department raised concerns about the identification of misappropriation as a non-preempted action, Congress chose to omit the entire list from the final bill. <u>See</u> 5 Patry, <u>supra</u>, § 18:8, at 18-27 to 18-31 (discussing confusing colloquy between House Judiciary Committee members regarding deletion of list). Thus, it is not clear what weight the Report excerpt quoted in <u>NBA</u> can bear in any assessment of whether a particular "hot news" claim survives federal copyright preemption. <u>See generally</u> <u>Architectronics, Inc. v. Control Sys., Inc.</u>, 935 F. Supp.

7

425, 440-41 (S.D.N.Y. 1996) (declining to rely on § 301's "puzzling and unreliable" legislative history); cf. B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1203-05 (2d Cir. 1992) (declining, in context of analyzing Comprehensive Environmental Response, Compensation, and Liability Act, to rely on legislative history "reveal[ing] a picture more confusing than pellucid").

NBA next identified five factors central to a non-preempted "INS-like" claim: (1) the plaintiff incurred costs to generate or gather information (2) that is time-sensitive and (3) used by the defendant in a manner constituting free-riding (4) in direct competition with plaintiff's product when (5) the ability of parties to free-ride so reduces the incentive to produce the product that its existence or quality is substantially threatened. 105 F.3d at 852.[3] I share the concern expressed by some courts and commentators as to whether these "extra elements" qualitatively differentiate a "hot news" tort from a claim of unauthorized copying or distribution, activities violating rights equivalent to those within the general scope of § 106. See 5 Patry, supra, § 18:40, at 18-139 to 18-141 (questioning whether NBA's factors are sufficient to avoid preemption). "Free riding" in this context appears synonymous with proscribed copying. See id. § 18:40, at 18-140 ("[C]opying information someone else generated . . . can always be characterized as free riding . . . ."); Lowry's Reports, Inc. v.

---

[3] NBA's test is sometimes mischaracterized as identifying the "elements" of a "hot news" tort under state law. See, e.g., Pollstar v. Gigmania, Ltd., 170 F. Supp. 2d 974, 979 (E.D. Cal. 2000). The federal courts, however, cannot create New York common law. That task is reserved for New York courts. Rather, the NBA test attempts to define a subset of New York "hot news" claims surviving preemption.

8

Legg Mason, Inc., 271 F. Supp. 2d 737, 756 (D. Md. 2003) (noting that free riding "may be a pejorative description of copying, but it is still copying" (internal quotation marks omitted)).  Although the other four NBA factors may narrow the tort's scope to egregious instances of "free riding" factually similar to INS, they do not appear to alter the nature of the claim.  See Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d at 756 (noting that "cost," "time sensitivity," and "direct competition . . . merely define pre-existing conditions" while "threat" to plaintiff's business "merely identifies a consequence of" free riding).  Accordingly, I share some of the majority's doubt regarding the viability of NBA's test, but for a different reason.  I question whether the test adequately identifies tort claims with "extra elements" qualitatively different from the rights protected by copyright.

> b.      *NBA*'s Test Is Not *Dictum*

Despite my reservations regarding NBA's test, I think it controls our resolution of this appeal.  My colleagues in the majority are of a different view.  They conclude that NBA "held" only that the facts presented could not establish a non-preempted "hot news" claim.  Ante at **[54 & n.32]**.  They dismiss NBA's five-part test as an unnecessary discussion of hypothetical circumstances giving rise to a "hot news" claim, which, as dictum, we need not follow.  See  ante at **[51-54 & n.32]**.  I am not convinced.

In holding that the NBA plaintiff failed to assert a non-preempted "hot news" claim, the court was required to determine the "breadth of the 'hot news' claim that survives preemption."  See NBA, 105 F.3d at 850 (emphasis in original).  To answer that "crucial question," id., the court identified five factors required to state a non-preempted "hot news"

9

claim, applied them to the facts presented, and concluded that plaintiff's claim failed, id. at

845, 852-54. Because the test was thus necessary to the opinion's result, it is not dictum.

See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 66-67 (1996) (noting Supreme Court

bound "not only [to] the result" of prior opinions but also to portions "necessary" to that

result); Baraket v. Holder, 632 F.3d 56, 59 (2d Cir. 2011) ("[I]t is not substantive discussion

of a question or lack thereof that distinguishes holding from dictum, but rather whether

resolution of the question is necessary for the decision of the case."); Hormel Foods Corp.

v. Jim Henson Prods., Inc., 73 F.3d 497, 508 (2d Cir. 1996) (stating that dictum refers to

observations that "could have been deleted without seriously impairing the analytical

foundations of the holding" (internal quotation marks omitted)).

The majority doubts whether the five-part test could be part of NBA's "holding"

because the opinion twice describes that test and once identifies three, rather than five,

needed "extra elements," namely, (1) the time-sensitive value of the information; (2) free-

riding; and (3) the threat to the existence of plaintiff's product. See ante at **[55-58]** (citing

NBA, 105 F.3d at 845, 852-53). In fact, the two iterations of the five-part test are almost

identical despite one version's citation to stronger language from INS requiring the

competition to "cut off the service by rendering the cost prohibitive." NBA, 105 F.3d at 842,

852-53 (internal quotation marks omitted). Moreover, in its three-element formulation, NBA

emphasized the need for a "hot news" plaintiff to show "free riding . . . enabling the

defendant to produce a directly competitive product for less money because it has lower

costs." Id. at 854 (emphasis added). Direct competition is thus essential to a non-preempted

10

claim, whether such competition is identified as a distinct element of a five-part test or as part of the free-riding component of a three-part test. Cf. United States v. Quinones, 511 F.3d 289, 315-16 (2d Cir. 2007) (identifying no error in charge that defined racketeering by reference to three elements rather than traditional five where "three-element formulation" included "all the factual findings necessary to support" conviction). Similarly, the gathering of information at a cost appears to be a prerequisite under both iterations of the NBA test because the three-part formulation requires time-sensitive information. Any remaining differences may afford flexibility for future panels to explain particular elements but they do not permit wholesale abandonment of the test as dictum.

Even if the test were dictum, such a strong statement of standards deserves "close consideration" and respect. Jimenez v. Walker, 458 F.3d 130, 142 (2d Cir. 2006); see also United States v. Garcia, 413 F.3d 201, 232 n.2 (2d Cir. 2005) (Calabresi, J., concurring) ("Emphatic dicta will and should be afforded more weight by later panels than casual dicta."). This is especially true here because the parties and district court all appear to have viewed the test as controlling at trial. See Barclays Capital Inc. v. Theflyonthewall.com, 700 F. Supp. 2d at 335. Further, even if NBA's two iterations of the "extra element" test are confusing, no clearer understanding of the scope of non-preempted "hot news" misappropriation claims is achieved simply by identifying other factual differences between the instant case and INS. See ante at **[60-69]**.

Thus, I would apply the NBA test to this case and reverse on the ground that the Firms failed to satisfy its direct competition requirement for a non-preempted claim.

11

In concluding that the Firms failed to establish a non-preempted "hot news" claim under the test identified in NBA, I rely on facts emphasized by the majority, namely, that Fly produces an aggregate product reporting many Firms' Recommendations among other financial news, and attributing each Recommendation to its source, while the Firms each disseminate only their own Recommendations to clients who engage in a particular level of trading with the Firms. See ante at **[60-69]**. The majority, however, uses these facts to draw a bright line distinguishing between the Firms, who generate news, and Fly and other news aggregators, who "break" the news, with the former falling outside of hot-news protection. See ante at **[61]**. I am not convinced that this distinction is determinative here because the Firms appear to play both roles. Not only do they generate their Recommendations, they then disseminate them, recouping the cost of generation through trading revenue. I am not prepared to foreclose the possibility of a "hot news" claim by a party who disseminates news it happens to create. I conclude simply that the facts emphasized by the majority preclude the Firms from stating a non-preempted "hot news" claim for a different reason derived from NBA: the Firms' product and Fly's newsfeed do not directly compete.

Although NBA turned on the plaintiff's failure to show free riding on and a sufficient threat to its services, the court there discussed the direct competition element in noting that the plaintiff had "compresse[d] and confuse[d] three different informational products." 105 F.3d at 853. Separating the NBA's dissemination of live basketball games and copyrighted

12

broadcasts from its collection and transmission of factual material about the games through a pager service, the court determined that only the latter might directly compete with the defendant's product, another pager service providing facts about live games. See id. at 853-54 (noting "separate market for" pager service). In other words, only products in the "keenest" of competition satisfy the direct competition requirement for a non-preempted claim. INS, 248 U.S. at 221, 230 (stating that plaintiff and defendant newspaper companies were "in the keenest competition" in gathering and publishing news throughout United States).

In this case, I identify no clear error in the district court's impressively thorough fact-finding. See Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, 631 F.3d 42, 52 (2d Cir. 2011) (applying clear error review to factual findings after bench trial). But reviewing legal determinations de novo, see id. at 51, I conclude that the direct competition element of NBA's test was applied more broadly than warranted. Whatever Fly's ultimate purpose or impact in distributing the Firms' Recommendations, the critical consideration for purposes of identifying direct competition is the substantial similarity of the products in satisfying relevant market demand.

In concluding that direct competition was established, the district court observed that both the Firms and Fly disseminate "Recommendations to investors for their use in making investment decisions." Barclays Capital Inc. v. Theflyonthewall.com, 700 F. Supp. 2d at 339. Such a broad similarity between the companies' overall goals does not constitute the substantial similarity required for direct competition. Even assuming that the Firms'

13

distribution of research reports is one of its "primary businesses," each Firm distributes only its own Recommendations to investors most likely to follow its advice and place a trade through it.  See id. at 316-19.[4]  The Firms do not aggregate or distribute other Firms' Recommendations.  See id. at 317.  To do so would interfere with the Firms' business model, which is based on investors' inclinations to trade with the Firm from which they received a Recommendation.  See id. at 318-19.  Indeed, the Firms limit full access to their research to clients who generate sufficient trading revenue.  See id. at 319.  By contrast, Fly does not produce any of its own recommendations or seek trading commissions.  See id. at 322-24.  Rather, it "collect[s] and publish[es] financial news" to anyone interested in such information through a subscription service, the most lucrative aspect of which is the distribution of sixty-five firms' Recommendations, with each Recommendation attributed to its source.  Id. at 322-24.

It bears noting that, like the district court, I view Fly's conduct as strong evidence of free-riding, or worse depending on how it came into possession of the Recommendations.  See id. at 336-37.  Although Fly expends some effort to gather and aggregate the Recommendations, Fly is usurping the substantial efforts and expenses of the Firms to make

---

[4] Noting NBA's discussion of direct competition in a "primary market," the district court concluded that the Firms' dissemination of Recommendations is one of their "primary businesses" "central" to the Firms' business model.  Barclays Capital Inc. v. Theflyonthewall.com, 700 F. Supp. 2d at 339 (internal quotation marks omitted).  Considering the vast resources used to create the research reports and the use of those reports to generate trading revenue, I accept for purposes of this appeal that equity research does constitute a primary business of the Firms.

a profit without expending any time or cost to conduct research of its own. I cannot celebrate such practices, which allow Fly "to reap where it has not sown." INS, 248 U.S. at 239. As the majority notes, however, such apparent unfairness does not control preemption analysis. See ante at **[44-48]**. Although Fly free-rides on the Firms' efforts, Fly's attribution of aggregate Recommendations demonstrates the crucial difference between the businesses: while the Firms disseminate only their own Recommendations to select clients most likely to follow the advice and place trades with the Firms, Fly aggregates and disseminates sixty-five firms' Recommendations and other financial information to anyone willing to pay for it without regard to whether clients accept or trade on particular Recommendations.

An example illustrates the distinction. Two firms might disseminate opposing Recommendations on the same stock. These two firms directly compete in attempting to convince clients to follow their Recommendation and place a trade. Fly, on the other hand, would presumably report both opinions (as well as scores of others) to its readers without regard to whether they trade on the information. Some investors may place a particular value on learning all Recommendations, and some people may have a general interest in learning such news even without wishing to invest. Thus, Fly's product may directly compete with that of other financial news outlets, such as Dow Jones, that also seek to provide all Recommendations to anyone interested in such news. See Associated Press v. All Headline News Corp., 608 F. Supp. 2d 454, 457-58, 461 (S.D.N.Y. 2009) (holding that plaintiff news agency sufficiently pleaded "hot news" tort by alleging that defendant news service copied and distributed plaintiff's stories under defendant's name). But Fly's aggregate subscription

15

product is sufficiently distinct from the Firms' business model, which cannot be divorced from the trading market it targets, to preclude a finding of the direct competition required by NBA's test.[5]

The district court observed that Fly intended its newsfeed to fulfill "demand for the original work" as evidenced by its recent distribution of the newsfeed through discount brokers, thereby creating the "final stage" of direct competition by driving away commission revenue. Barclays Capital Inc. v. Theflyonthewall.com, 700 F. Supp. 2d at 339-40 (internal quotation marks omitted). The discount brokers, however, are simply one of many third-party distributors that disseminate Fly's newsfeed. See id. at 324-25. While the discount brokers separately place trades, Fly does not endorse investment advice or seek commission revenue. Moreover, as the majority points out, even the Firms' authorized clients are free to use discount brokers once they receive a Recommendation. See ante at **[66]**. Thus, although some investors may use Fly's newsfeed instead of paying for direct receipt of the Firms' Recommendations, the overlap in potential clients does not make the products or their targeted markets sufficiently similar to satisfy NBA's direct competition requirement for a non-preempted claim.

---

[5] The majority offers an apt hypothetical for how the Firms and Fly might directly compete under different circumstances. If, aside from distributing its own opinion, the Firms disseminated other Firms' Recommendations, Fly might directly compete with such a similar aggregate product. See ante at **[68-69]**; see also NBA, 105 F.3d at 854 (noting potential "hot news" claim if defendant "in the future were to collect facts from" plaintiff's pager system). Similarly, if Fly tracked and reported the Recommendations of only one firm, that firm might have a stronger claim of direct competition.

16

3.    Conclusion

I join the court in deciding to affirm in part and vacate and remand in part the judgment in favor of the Firms.  As to the decision to vacate, I must respectfully decline to join in the majority opinion.  I conclude that the Firms' "hot news" misappropriation claims are preempted by federal copyright law because the Firms cannot demonstrate direct competition with Fly as required by this court's test in NBA, 105 F.3d at 845, 852-53. Whatever reservations I may have about that test's ability to identify extra elements for a "hot news" misappropriation claim that are qualitatively different from the rights protected by federal copyright law, I cannot join the majority in dismissing the test as dictum.  Further, because I think the Firms fail to satisfy even NBA's test, I see no need to reach the same preemption conclusion by reference to other factual differences between this case and INS, 248 U.S. 215.